AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Western District of Texas

**FILED**

September 05, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____KT_____
DEPUTY

| United States of America | ) | |
| v. | ) | |
| | ) | Case No. 1:24-MJ-457 |
| | ) | |
| | ) | |
| KAMO KIRAKOSYAN | ) | |
| *Defendant(s)* | ) | |

## AMENDED CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  December 2021 through present  in the county of  Travis and elsewhere  in the
Western  District of  Texas and elsewhere , the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 USC 371 | Conspiracy to commit an offense against the United States |
| 18 USC 371 | Conspiracy to defraud the United States |
| 50 USC 4819 | Violation of the Export Control Reform Act |
| 50 USC 4819 | Attempted Violation of the Export Control Reform Act |
| 18 USC 554 | Smuggling Goods from the United States |

This criminal complaint is based on these facts:

See attached

☒ Continued on the attached sheet.

*William Moulds*
*Complainant's signature*

Special Agent William Clarence Moulds
*Printed name and title*

☐ Sworn to before me and signed in my presence.
☒ Sworn to telephonically and signed electronically.

Date:  September 5, 2024

*Judge's signature*

City and state:  Austin, TX

Dustin M. Howell, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF AMENDED COMPLAINT AND ARREST WARRANT**</u>

I, William Clarence Moulds, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I am employed as a Special Agent of the U.S. Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), assigned to San Antonio, and have been employed with BIS since July 2015.  I am empowered by law to investigate and make arrests for offenses involving the unlawful export of goods and technology to destinations outside the United States.  Prior to this, I was employed as a Border Patrol Agent with the U.S. Department of Homeland Security, Customs and Border Protection, United States Border Patrol, from July 2011 to July 2015.  I am familiar with criminal conspiracies designed to violate United States export control laws, including via the illegal transshipment of controlled U.S.-origin goods through third-party countries.  Among other things, the members of such organized criminal enterprises often use intermediary purchasers to conceal the intended end users or countries from manufacturers and shippers, use various means of electronic communication (such as e-mail) to coordinate criminal activities, and engage in financial transactions intended to conceal the nature, source, and intended uses of criminal funds and proceeds.  My training and experience includes obtaining criminal complaints and testifying in court or before grand juries in export control cases.

2.      On July 31, 2024, United States Magistrate Judge Susan Hightower issued a warrant for the arrest of Armenian national Kamo KIRAKOSYAN for the offenses listed below. (1:24-mj-00457-SH.) On or about August 21, 2024, KIRAKOSYAN was arrested in Germany pursuant to a provisional arrest request issued by the United States.  KIRAKOSYAN is currently in extradition proceedings in Germany.  In connection with the extradition proceedings, the

United States will submit, among other things, the Complaint, arrest warrant, a prosecutor affidavit, and an agent affidavit.  Among the factors considered by German courts in determining whether to grant extradition is whether the conduct alleged is also criminal under German law (a principle referred to as "dual criminality").  The government understands that additional facts gathered during the investigation, but not included previously in the original Complaint affidavit may assist German courts in deciding whether to grant extradition and under what terms.  The purpose of this affidavit is to amend the original Complaint affidavit with supplemental facts about the criminal scheme and efforts to violate U.S. and international sanctions, and to seek a new arrest warrant.  The amended Complaint also restructures and reformats certain factual information.  The government expects that the amended Complaint and the arrest warrant will then be submitted to the German government in connection with the extradition.

3.    The offenses for which KIRAKOSYAN's arrest warrant issued and for which I submit this application for a new arrest warrant (the "Subject Offenses") are:

a.    Count One: From on or about February 24, 2022 to the present, in the Western District of Texas and elsewhere, Kamo KIRAKOSYAN and others known and unknown did knowingly and willfully conspire to commit crimes against the United States, in violation of 18 U.S.C. § 371, to wit:

i.    To knowingly and willfully export and reexport goods subject to the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774, from the United States to the Russian Federation through the Republic of Armenia without having first obtained the required licenses from BIS, in violation of the Export Control Reform Act ("ECRA"), 50 U.S.C. § 4819;

ii.   To knowingly and willfully engage in transactions intended to evade the
EAR, in violation of 50 U.S.C. § 4819;

iii.   To knowingly and willfully violate or cause a violation of a license, order,
regulation, and prohibition issued pursuant to the International Emergency
Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705;

iv.   To knowingly and willfully engage in transactions intended to evade the
IEEPA, in violation of 50 U.S.C. § 1705;

v.   To fraudulently and knowingly export and send from the United States
merchandise, articles, and objects contrary to law and regulations of the
United States, and receive, conceal, and sell, and facilitate the
transportation, concealment, or sale of such merchandise, articles, and
objects, prior to exportation, knowing the same to be intended for
exportation contrary to laws and regulations of the United States, in
violation of 18 U.S.C. § 554(a); and

vi.   To knowingly fail to file Electronic Export Information through the
Automated Export System, and cause the same, in violation of 13 U.S.C. §
305.

b.  Count Two: From on or about February 24, 2022 to the present, in the Western
District of Texas and elsewhere, Kamo KIRAKOSYAN and others known and
unknown did knowingly and willfully conspire to defraud the United States and
its agencies by impeding, impairing, obstructing, and defeating the lawful
functions of the following agencies through deceitful and dishonest means, in
violation of 18 U.S.C. § 371, to wit:

    i.   The U.S. Department of Commerce in the enforcement of ECRA and the EAR;

    ii.   The U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") in the enforcement of IEEPA and sanctions regulations, including the Specially Designated Nationals and Blocked Persons ("SDN") List; and

    iii.   The U.S. Customs and Border Protection in the enforcement of the Federal Trade Regulations, including the Electronic Export Information filing requirements.

c.   Count Three: In or around April 2022, within the Western District of Texas and the extraterritorial jurisdiction of the United States, Kamo KIRAKOSYAN did knowingly and willfully attempt to export and reexport, to cause to be exported and reexported, to evade U.S. export control laws, and to buy, conceal, sell, transfer, transport, forward, and otherwise service, in whole or in part, and conduct negotiations to facilitate the export from the United States to the Russian Federation via the Republic of Armenia certain goods that he believed were subject to U.S. export control laws, to wit: a standalone cleaner used in, among other applications, the manufacture of silicon on sapphire semiconductor wafers, semiconductors, and display panels, in violation of ECRA, 50 U.S.C. § 4819;

d.   Count Four: In or around April 2022, within the Western District of Texas and the extraterritorial jurisdiction of the United States, Kamo KIRAKOSYAN did fraudulently and knowingly attempt to receive, conceal, and sell and to facilitate the transportation, concealment, and sale of merchandise, to wit: a standalone

cleaner used in, among other applications, the manufacture of silicon on sapphire

semiconductor wafers, semiconductors, and display panels, prior to exportation,

knowing the same was intended for exportation from the United States contrary to

laws and regulations of the United States, in violation of 18 U.S.C. § 554(a);

e.  Count Five: In or around May 2022, within the extraterritorial jurisdiction of the

United States, Kamo KIRAKOSYAN did knowingly and willfully export,

reexport, and cause to be exported and reexported from the United States to the

Russian Federation via the Republic of Armenia certain goods without the

required license from BIS, to wit: a Matrixx Standard HiPIMS Switch-1 Input > 4

Outputs, and did evade U.S. export control laws, in violation of ECRA, 50 U.S.C.

§ 4819; and

f.  Count Six: In or around May 2022, within the extraterritorial jurisdiction of the

United States, Kamo KIRAKOSYAN did fraudulently and knowingly receive,

conceal, and sell and did facilitate the transportation, concealment, and sale of

merchandise, to wit: a Matrixx Standard HiPIMS Switch-1 Input > 4 Outputs,

prior to exportation, knowing the same was intended for exportation from the

United States contrary to laws and regulations of the United States, in violation of

18 U.S.C. § 554(a).

4.    This affidavit is intended to show merely that there is sufficient probable cause

for the requested arrest warrant and does not set forth all my knowledge about this matter.  The

information in this affidavit is drawn from my participation in the investigation, law enforcement

reports, a review of search warrant returns and documentary evidence, as well as conversations

with other investigators and witnesses.  All statements are set forth in sum and substance and relevant part. All translations are in draft form and subject to further revision.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that KIRAKOSYAN, together with others, has committed the Subject Offenses in connection with the illegal export and reexport of U.S.-origin goods from the United States to the Russian Federation through the Republic of Armenia and that involved transactions with and for the benefit of sanctioned persons.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction to issue the requested warrant.  As discussed more fully below, acts or omissions in furtherance of the conspiracies charged under 18 U.S.C. § 371 occurred within the Western District of Texas.  *See* 18 U.S.C. § 3237.  Additionally, this Court has jurisdiction over the substantive violations of ECRA, 50 U.S.C. § 4819; and Smuggling Goods from the United States, 18 U.S.C. § 554(a), because they occurred in Armenia within the extraterritorial jurisdiction of the United States.  Venue for offenses "committed . . . out of the jurisdiction of any particular State or district, shall be in the district in which the offender . . . is arrested or first brought" or the District of Columbia.  18 U.S.C. § 3238.  Venue thus would be proper for the substantive violations of ECRA and Smuggling Goods from the United States in the Western District of Texas so long as KIRAKOSYAN, a resident and citizen of Armenia as explained below, is first brought to this district.

## STATUTORY AUTHORITY

### Export Control Reform Act

7.      ECRA provides, among its stated policy objectives, that "[t]he national security and foreign policy of the United States require that the export, reexport, and in-country transfer

of items, and specific activities of United States persons, wherever located, be controlled . . . ."
50 U.S.C. § 4811(2).  To that end, ECRA grants the President the authority to control "(1) the
export, reexport, and in-country transfer of items subject to the jurisdiction of the United States,
whether by United States persons or by foreign persons; and (2) the activities of United States
persons, wherever located, relating to" specific categories of items.  *Id.* at § 4812(a).  ECRA
further grants to the Secretary of Commerce the authority to establish the applicable regulatory
framework.  *Id.* at § 4813(a).

    8.    Pursuant to ECRA, BIS reviews and controls the export of certain items,
including commodities, software, and technologies, from the United States to foreign
destinations through the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774.  In
particular, the EAR restrict the export of items that could make a significant  contribution to the
military  potential of other nations or that could be detrimental to the foreign policy or national
security of the United States.  The EAR impose licensing and other requirements for items
subject to the EAR to be exported lawfully from the United States or reexported lawfully
from one foreign destination to another.

    9.    The most sensitive items subject to EAR controls are identified on the Commerce
Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1.  Items on the CCL are
categorized by an Export Control Classification Number ("ECCN") based on their technical
characteristics.  Each ECCN has export control requirements depending on the destination, end
user, and end use.  The remaining items that are subject to the EAR but are not listed on the CCL
are classified as EAR99.

    10.    On February 24, 2022, Russia launched an unprovoked, full-scale invasion of
Ukraine.  In response, on the same day, BIS implemented new restrictions on exports and

reexports to Russia.  Specifically, among other measures imposed by BIS, exports, reexports, and in-country transfers of all items subject to the EAR that are classified in Categories 3-9 of the CCL (including certain semiconductors, microelectronics, computers, telecommunications, information security equipment, lasers, and sensors) require a license to Russia.  Applications for such a license are subject to a policy of denial with certain limited exceptions.  BIS also imposed a license requirement with a policy of denial for exports, reexports, or transfers in-country of all items subject to the EAR, with limited exceptions, to Russian military end users and military end uses as well as to the so-called Donetsk People's Republic and Luhansk People's Republics regions of Ukraine.[1]  *See* 87 Fed. Reg. 12,226 (Mar. 3, 2022).  Further, BIS has added numerous Russian entities to its Entity List, published at 15 C.F.R. part 744, Supp. No. 4, which imposes an entity-specific license requirement for all items subject to the EAR, with a general policy of denial.

11.    In response to Russia's ongoing aggression against Ukraine, BIS has imposed additional restrictions on exporting U.S.-origin items directly or indirectly to Russia.  On April 8, 2022, BIS expanded the licensing requirements to Russia to include *any* item on the CCL.  15 C.F.R. § 746.8(a)(1).  On May 9, 2022, BIS imposed a license requirement for exports and reexports to Russia for items subject to the EAR with specific Harmonized Tariff Schedule ("HTS") codes,[2] including the Matrixx Standard HiPIMS Switch-1 Input > 4 Outputs.  *See* 87 Fed. Reg. 28,758 (May 13, 2022).[3]  On May 19, 2023, BIS imposed a license requirement for

---

[1] BIS maintains a similar license requirement for the Crimea region of Ukraine, which has been under Russian occupation since 2014.  15 C.F.R. § 746.6.

[2] HTS is a classification system used in the United States to help determine customs duties to be paid on imports of merchandise into the United States.  The first six digits of the HTS code contain the Harmonized System ("HS") code, which is a standardized numerical method of classifying traded products used by countries around the world.

[3] The Matrixx Standard HiPIMS Switch-1 Input > 4 Outputs has an HS code of 8535.30.  Certain HS codes also are controlled under the European Union Common High Priority List, including HS code 8486.10 (which covers the Large Substrate Cleaner LSC4000 and Single Wafer Cleaner SWC3000) and HS code 8534.00 (which covers the

exports and reexports to Russia for additional HTS code items, including evaporation pellets (discussed further below in the probable cause section). *See* 88 Fed. Reg. 33,430 (May 23, 2023). This means that many U.S.-origin items that are subject to the EAR and designated EAR99 (*i.e.*, not listed on the CCL) require an export license to Russia. License applications for the export or reexport to Russia of such items are reviewed by BIS under a policy of denial.

12.     Pursuant to 50 U.S.C. § 4819(a)(1), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this subchapter or of any regulation, order, license, or other authorization issued under this subchapter, including any of the unlawful acts described in paragraph (2)." Such unlawful acts include, among other acts, that "[n]o person may engage in any transaction or take any other action with intent to evade the provisions of this subchapter, the [EAR], or any order, license, or authorization issued thereunder" and that "[n]o person may order, buy, remove, conceal, store, use, sell, loan, dispose of, transfer, transport, finance, forward, or otherwise service, in whole or in part, or conduct negotiations to facilitate such activities for, any item exported or to be exported from the United States, or that is otherwise subject to the [EAR], with knowledge that a violation of this subchapter, the [EAR], or any order, license or authorization issued thereunder, has occurred, is about to occur, or is intended to occur in connection with the item unless valid authorization is obtained therefor." *Id.* § 4819(a)(2)(E), (G). Pursuant to 50 U.S.C. § 4819(b), "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids and abets in the commission of, an unlawful act described in subsection (a)" shall be guilty of a crime and subject to imprisonment of up to 20 years and fines of up to a $1,000,000.

---

Analog Input Modules 5100F and 5100K. These items are discussed below in the probable cause section. *See* EU Common High Priority List, https://finance.ec.europa.eu/system/files/2023-09/list-common-high-priority-items_en.pdf.

## International Emergency Economic Powers Act

13.    Under IEEPA, 50 U.S.C. §§ 1701-1707, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States.  50 U.S.C. § 1701(a).  Pursuant to that authority, the President may declare a national emergency through Executive Orders that have the full force and effect of law.  *Id.*  Among other things, IEEPA empowers the President to issue Executive Orders and regulations governing and prohibiting certain transactions.  *Id.* § 1704.

14.    It is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to IEEPA.  *Id.* § 1705(a).  Willful violations of IEEPA constitute criminal offenses and carry a 20-year maximum term of imprisonment and up to a $1,000,000 fine.  *Id.* § 1705(c).

15.    The President has issued Executive Orders finding that specified harmful foreign activities of the Russian Government-including the invasion and occupation of Ukrainian territory; efforts to undermine free and fair democratic elections and democratic institutions in the United States and its allies; malicious cyber-enabled activities; and efforts to undermine security in countries and regions important to United States national security-constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States.  *See, e.g.*, Exec. Order No. 13660, 79 Fed. Reg. 13,491 (Mar. 10, 2014); Exec. Order No. 13661, 79 Fed. Reg. 15,533 (Mar. 19, 2014); Exec. Order No. 13662, 79 Fed. Reg. 16,167 (Mar. 24, 2014); Exec. Order No. 13685, 79 Fed. Reg. 77,357 (Dec. 24, 2014); Exec. Order No. 13849, 83 Fed. Reg. 48,195 (Sept. 21, 2018), Exec. Order No. 14024, 86 Fed. Reg. 20,249 (Apr. 14, 2021); Exec. Order No. 14065, 87 Fed. Reg. 10,293 (Feb. 21, 2022).

16.     The President has delegated to OFAC the authority to sanction and designate individuals and entities on the SDN List pursuant to applicable Executive Orders.  U.S. persons are prohibited from engaging in transactions with SDNs without first obtaining a license or other written authorization from OFAC.  It also is prohibited to evade or avoid or cause a violation of the prohibitions set forth in the Executive Orders.

**Smuggling Goods from the United States**

17.     Title 18, United States Code, Section 554(a) provides: "Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both."

**Unlawful Export Information Activities**

18.     Title 13, United States Code, Section 305 provides that whoever "knowingly fails to file or knowingly submits false or misleading export information through the Shippers Export Declaration (SED) (or any successor document) [*i.e.*, the Electronic Export Information ("EEI")] or the Automated Export System (AES) shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both."  *See also* 15 C.F.R. § 30.71(a).  The EEI is information that must be filed through the AES for goods shipped from the United States to a foreign country when the value of the commodity is

greater than $2,500 or an export license is required to export the commodity. *See* 15 C.F.R. §§ 758.1(b), 30.2, 30.37(a).

**Conspiracy**

19.     Under 18 U.S.C. § 371, it is illegal to conspire to commit an offense against the United States or to defraud the United States, or any agency thereof.

**PROBABLE CAUSE**

20.     Based on the facts set forth in this affidavit, there is probable cause to believe that KIRAKOSYAN conspired with, among others, individuals located in Russia in furtherance of a scheme to illegally obtain controlled U.S.-origin goods for export to Russia, including for and on behalf of entities on the SDN List, via transshipment through Armenia. Objects of the conspiracy include the evasion of U.S. export control and sanctions laws imposed after Russia's invasion of Ukraine.

**Individuals and Entities Involved In or Affected By the Joint Criminal Enterprise**

21.     Kamo KIRAKOSYAN is a resident and citizen of Armenia.

22.     Joint Stock Company Vakuum.ru ("Vakuum") is a business based in Russia. On February 24, 2023, OFAC designated Vakuum on the SDN List, subjecting the Russian company to U.S. blocking sanctions and a general prohibition on business interactions with U.S. persons or entities. OFAC designated this Russia-based company, which specializes in the sale of manufacturing and technological equipment to Russia-based customers, for working with the Russian intelligence-linked procurement network of U.S.-sanctioned Malberg Ltd. to obtain advanced equipment with applications in the microelectronics and quantum industries.

23.    Russian Co-Conspirator 1 is a resident and citizen of Russia.  He is also a director of Vakuum, which has been used by the co-conspirators as a criminal enterprise to illegally obtain U.S.-origin goods.

24.    Russian Co-Conspirator 2 is an employee of Vakuum.

25.    Russian Co-Conspirator 3 is an employee of Vakuum who holds herself out as the "General Director" of Vakuum.

26.    U.S. Company 1 is a company based in Danbury, Connecticut, United States that holds itself out a global supplier of high power radio frequency ("RF") generators, high voltage DC plasma generators, microwave power system products and, plasma processing tools specifically designed for industrial and scientific applications.

27.    U.S. Company 2 is a company based in San Jose, California, United States that, among other things, manufactures sputtering targets and evaporation pellets, and produces custom alloys and high purity metals.

28.    U.S. Company 3 is a company based in Hopkinton, Massachusetts, United States that provides automation solutions for high-tech applications.

29.    U.S. Company 4 is a company based in Austin, Texas, United States that, among other things, designs, develops, and manufactures single wafer-thin film processing systems that have applications in, among other things, semiconductor manufacturing.

30.    German Company 1 is a company based in Vaihingen an der Enz, Germany that manufactures equipment such as vacuum pumps and compressors.

**Additional Entities**

31.    As described below, Russian Enterprise 1 and the co-conspirators had direct contacts with other entities sanctioned by the United States (meaning on the SDN List or Entity

List) and/or European Union.  The co-conspirators were often in the position of suppliers to the other entities.  In some cases, the sanctions were imposed after the relevant transactions or attempts.  For convenience, the entities and the dates they were sanctioned are listed here.

32.     Federal State Unitary Enterprise Dukhov Automatics Research Institute ("VNIIA") is a Russian institute that designs nuclear warheads for both strategic and tactical platforms, including the design and production of electric and neutron initiation systems for Russia's warheads.[4]  Effective February 24, 2022, BIS added VNIIA to the Entity List, thereby requiring a license to export or reexport U.S items subject to the EAR to VNIIA.  *See* 87 Fed. Reg. 12,226 (Mar. 3, 2022).[5]  On February 24, 2023, OFAC designated VNIIA on the SDN List, subjecting it to U.S. blocking sanctions and a general prohibition on business interactions with U.S. persons or entities.[6]  VNIIA has also been sanctioned by the European Union.[7]

33.     Federal State Unitary Enterprise "Central Research Institute of Chemistry and Mechanics" ("TsNIIKhM") is based in Moscow and focuses on research and development in the areas of chemistry and mechanics based on open-source information.  TsNIIKhM was designated as an SDN by OFAC pursuant to the Countering America's Adversaries Through Sanctions Act (CAATSA) on or about October 23, 2020.[8]  It was also added to the Entity List on May 19,

---

[4] *See* U.S. Dept. of State, Fact Sheet, The United States Takes Sweeping Actions on the One Year Anniversary of Russia's War Against Ukraine, Feb. 24, 2023, https://pl.usembassy.gov/sweeping_actions/.

[5] BIS moved VNIIA to its Entity List from its Military End-User List, on which BIS had placed VNIIA effective December 23, 2020, which required a license to export or reexport specified items subject to the EAR destined for VNIIA, a military end user.  *See* 87 Fed. Red. 12,226 (Mar. 3, 2022); 85 Fed. Reg. 83,793 (Dec. 23, 2020).

[6] U.S. Dept. of State, Fact Sheet, The United States Takes Sweeping Actions on the One Year Anniversary of Russia's War Against Ukraine (Feb. 24, 2023), https://www.state.gov/the-united-states-takes-sweeping-actions-on-the-one-year-anniversary-of-russias-war-against-ukraine/.

[7] On February 25, 2022, the European Union adopted Council Decision ("CFSP") 2022/327, which imposed sanctions on Russian entities. including VNIIA, in response to Russia's actions destabilizing the situation in Ukraine.  *See* CFSP 2022/327, https://eur-lex.europa.eu/eli/dec/2022/327/oj.

[8] *See* U.S. Dept. of the Treasury, Press Release, Treasury Sanctions Russian Government Research Institution Connected to the Triton Malware (Oct. 23, 2020), https://home.treasury.gov/news/press-releases/sm1162.

2023.[9]  TsNIIKhM has also been sanctioned by the United Kingdom on March 24, 2022[10] and Switzerland.

34.     MPI Volna is a Russian company that provides components and electronics to the Russian government.  MPI Volna was added to the Entity List on March 9, 2022[11] and sanctioned by the European Union on March 15, 2022.[12]

35.     The Budker Institute for Nuclear Physics has been described by the Treasury Department as "one of Russia's leading physics research centers and focuses on the development of new technologies."[13]  On or about July 20, 2023, the Budker Institute for Nuclear Physics was added to OFAC SDN list along with other entities.  The Treasury Department designated these entities in part to constrain Russia's military capabilities and access to battlefield supplies.

36.     Bauman State Technical University or "MSTU named after N.E. Baumann."  This university is also known as Moscow State Technical University Named After N.E. Baumann, a research university located in Russia.[14]  On November 2, 2023, this university was added to the OFAC SDN list as a sanctioned entity.  The State Department described it as a "Russian state university that has joint ventures with U.S.-designated military conglomerate ROSTEC, as well

[9] 88 Fed. Reg. 32,640 (May 22, 2023), https://www.federalregister.gov/documents/2023/05/22/2023-10684/addition-of-entities-to-the-entity-list.

[10] Office of Financial Sanctions Implementation, HM Treasury, Consolidated List Of Financial Sanctions Targets In The UK (Last Updated July 5, 2024), https://assets.publishing.service.gov.uk/media/6639e73ccf3b5081b14f31a0/Cyber.pdf.

[11] 87 Fed. Reg. 13,141 (Mar. 9, 2022), https://www.federalregister.gov/documents/2022/03/09/2022-04925/further-imposition-of-sanctions-against-russia-with-the-addition-of-certain-entities-to-the-entity.

[12] Council Regulation (EU) 2022/428 of 15 March 2022, amending Regulation (EU) No 833/2014 concerning restrictive measures in view of Russia's actions destabilising the situation in Ukraine, https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX%3A32022R0428.

[13] See U.S. Dept. of the Treasury, Press Release, Treasury Sanctions Impede Russian Access to Battlefield Supplies and Target Revenue Generators (July 20, 2023), https://home.treasury.gov/news/press-releases/jy1636.

[14] See U.S. Dept. of the Treasury, Press Release, Russia-related Designations, Updates and Removal; Counter Terrorism Designation Update; Issuance of Russia-related General Licenses (Nov. 2, 2023), https://ofac.treasury.gov/recent-actions/20231102.

as military departments with technical courses in artillery, missile technology, and ammunition."[15]

37.    NM-Tekh is a Russian semiconductor manufacturing firm.  Publicly available news articles have indicated that NM-Tekh produces semiconductors and has been a part of Russia's efforts to achieve self-sufficiency in certain semiconductors and evade Western sanctions.  On or about March 9, 2022, NM-Tekh was added to the Department of Commerce Entity List with a license required for all items subject to the EAR and a policy of denial for such licenses.[16]

38.    JSC Zelenograd Nanotechnology Center ("ZNTC") is a company based in Zelenograd, Russia that develops and manufactures products in the field of microelectronics. On or about August 2, 2022, ZNTC was designated as an SDN.[17]  On or about February 27, 2023, ZNTC was added to the Entity List.[18]

## The Criminal Conduct

*Summary*

39.    Beginning on or about February 24, 2022, and continuing until the present, KIRAKOSYAN, together with Russian Co-Conspirators 1-3, and utilizing Vakuum, engaged in a conspiracy to violate U.S. export control and sanctions laws and defraud the United States. Additionally, KIRAKOSYAN illegally exported and reexported certain goods from the United

---

[15] *See* U.S. Dept. of State, Fact Sheet, Taking Additional Sweeping Measures Against Russia (Nov. 2, 2023), https://www.state.gov/taking-additional-sweeping-measures-against-russia/.

[16] 87 Fed. Reg. 13,141 (Mar. 9, 2022), https://www.federalregister.gov/documents/2022/03/09/2022-04925/further-imposition-of-sanctions-against-russia-with-the-addition-of-certain-entities-to-the-entity.

[17] U.S. Dept. of the Treasury, Press Release, Russia-related Designations, Designations Updates, and Designation Removal; Issuance of Russia-related General Licenses; Publication of Russia-related Frequently Asked Questions, https://ofac.treasury.gov/recent-actions/20220802.

[18] 88 Fed. Reg. 12,166 (Feb. 27, 2023), https://www.federalregister.gov/documents/2023/02/27/2023-04099/additions-of-entities-to-the-entity-list-revisions-of-entities-on-the-entity-list.

States to Russia through Armenia without the required licenses from BIS. KIRAKOSYAN and his co-conspirators also violated IEEPA by engaging in transactions with and for the benefit of entities on the SDN List without the required licenses from OFAC.

40.     The evidence gathered during the investigation revealed a series of unlawful shipments that established a pattern and practice of transshipments that support probable cause to believe that KIRAKOSYAN and co-conspirators have illegally obtained and attempted to illegally obtain U.S.-origin goods, as described below. The evidence further indicates that these individuals have joined together in a criminal enterprise to violate U.S. laws and defraud the United States. These transactions involved U.S. Companies 1-4, among others. The joint criminal enterprise between KIRAKOSYAN and the Russian Co-Conspirators involved the use of Vakuum, which was sanctioned by the U.S. government on February 24, 2023, as a tool to make payments, receive goods, and coordinate criminal activity. It also involved engaging in transactions with and on behalf of sanctioned entities in Russia, including the recipients and end users of the U.S.-origin goods. The joint criminal enterprise involved a chain of command in which KIRAKOSYAN's activities were directed and managed by the Russian Co-Conspirators, who maintained the authority to approve or reject transactions. Next, the relationship between KIRAKOSYAN and the others was contractual, with specific financial transactions and formalized terms. Finally, the joint criminal enterprise was involved in a broader effort to supply the Russian government, nuclear industry, and research institutions.

41.     During the criminal activity, KIRAKOSYAN acted knowingly and willfully. As detailed below, KIRAKOSYAN became the straw or substitute purchaser of U.S.-origin goods for the Russian Co-Conspirators and Vakuum shortly after Russia's full-scale invasion of Ukraine on February 24, 2022, and the imposition of additional sanctions and export restrictions

on Russia.  In May 2022, he sent Russian Co-Conspirator 1 instructions on opening a bank account in Armenia for the purpose of evading sanctions.  While negotiating with U.S. companies to purchase products, he represented himself as the Armenian buyer while having secret communications with the Russian Co-Conspirators; in those communications, the Russian Co-Conspirators gave him instructions, paid him for goods, and had him arrange transshipment of the goods to Russia through Armenia.  U.S. companies asked KIRAKOSYAN for end user statements (documents requiring a purchaser to specify the ultimate consignee of a good), and he did not provide truthful information about the end users.  U.S. companies specifically informed KIRAKOSYAN that certain shipments contained controlled U.S.-origin goods, whose unauthorized export or reexport to Russia was prohibited; KIRAKOSYAN nonetheless sent the goods from Armenia to Russia after receiving them from the United States.

***U.S. Company 1 Transaction***

42.      In December 2021, Vakuum reached an agreement with U.S. Company 1 to purchase a product described as a "Matrixx Switch Module."  The evidence indicates that, eventually, Vakuum and Russian Co-Conspirator 1 backed out of the deal after additional U.S. sanctions and export restrictions were imposed on Russia on February 24, 2022. KIRAKOSYAN stepped in to obtain the goods from the United States and then ship them to Russia via Armenia in order to evade U.S. export controls and sanctions.

43.      On December 7, 2021, Russian Co-Conspirator 2 emailed two employees of Vakuum and an employee of U.S. Company 1 with instructions to place an order for the U.S. Company 1's Matrixx products.  The purchase price, with a 10% discount for Vakuum, was $2,316.60.

44.     On February 24, 2022, the U.S. Company 1 employee emailed Russian Co-Conspirator 2 to state that the order was complete and packaged and sent the FedEx shipping pricing.  U.S. Company 1 also sent its banking information at Bank of America for payment by wire.  A Vakuum employee replied and indicated that Vakuum would arrange shipment with its own freight forwarder.  On February 28, 2022, the U.S. Company 1 employee sent a revised invoice.

45.     As described above, the United States placed additional sanctions and export restrictions on Russia after Russia's full-scale invasion of Ukraine on February 24, 2022.

46.     On March 2, 2022, the Vakuum employee informed the U.S. Company 1 employee that Vakuum had made the payment, which U.S. Company 1 confirmed two days later.  Then on March 11, 2022, the Vakuum employee emailed the U.S. Company 1 employee to indicate that Vakuum would attempt to arrange shipment but "now we have some issues with it" and it could take some time.  Based on the context, I believe this is a reference to the recently imposed sanctions.

47.     On the same day, the U.S. Company 1 employee replied and stated that he had "received an email from a German person asking for a quote on a switch with the same specifications – with a shipment to Armenia.  Is this request – somehow – connected to your order?"  On March 29, 2022, Russian Co-Conspirator 1 entered the conversation and wrote to the U.S. Company 1 employee: "We recheck that request from Armenia – it is from our end-user. Because he cannot buy through us now, he asked his friends in Europe.  Please ship our package to him and when he will pay 100% please return our payment back."  Based on the context, I believe that this indicates that Russian Co-Conspirator 1 believed that a shipment of this good could not go to Russia from the United States and thus an alternative shipping route was needed.

And as described below, this Armenian individual (KIRAKOSYAN) was not in fact the end user.

48.     While Vakuum and Russian Co-Conspirator 1 were communicating with the U.S. Company 1 employee in mid- to late-March 2022, Russian Co-Conspirator 1 and KIRAKOSYAN were separately discussing sending the goods to Armenia and then to Russia. On March 22, 2022, KIRAKOSYAN emailed U.S. Company 1 to purchase the same goods Vakuum was attempting to purchase. The same U.S. Company 1 employee who dealt with Vakuum wrote to KIRAKOSYAN with pricing for Matrixx Switch Modules for $2,316. The U.S. Company 1 employee asked, "Who is the customer?" and "What is the customer's address?" Based on my training and experience, these are common questions for companies trying to determine the end user of a good.

49.     On March 24, 2022, KIRAKOSYAN forwarded his communications with U.S. Company 1 to Russian Co-Conspirator 1. On April 7, 2022, U.S. Company 1 again sent shipment and payment details to KIRAKOSYAN and asked for "complete information regarding the customer (end user) in Armenia" including business name, contact name, email addresses, and telephone number together with a "written purchase order from the company in Armenia." KIRAKOSYAN again forwarded this email to Russian Co-Conspirator 1. On April 7, 2022, Russian Co-Conspirator 1 wrote to KIRAKOSYAN requesting information for a contact in Armenia and a written purchase order from the company in Armenia. Russian Co-Conspirator 1 wrote: "It will be on your behalf [referencing KIRAKOSYAN]. This is a small thing. I think no one will pay attention to him. He [referencing the U.S. Company 1 employee] needs it to report that he is doing everything legally." I believe this conversation reflects the co-conspirators' belief that they could evade detection by deceiving U.S. Company 1 as to the true end user.

50.     On April 25, 2022, U.S. Company 1 sent KIRAKOSYAN an invoice for the Matrixx Switch Modules for $2,316.  KIRAKOSYAN's address was listed in Yerevan, Armenia.

51.     An investigator has spoken with a representative of U.S. Company 1 and confirmed this shipment was sent to Armenia.  An investigator acquired a FedEx delivery confirmation showing a shipment date of May 10, 2022, from Danbury, CT, and a delivery date of May 17, 2022, to Yerevan, Armenia.

52.     An investigator has reviewed the FedEx shipping labels addressed to KIRAKOSYAN for these packages.[19]  They include the following warning on the front of the label:

These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations.

Investigators located a photo of this label in electronic search warrant returns for one of KIRAKOSYAN's accounts, and the geolocation metadata indicates that the photo was taken at coordinates that correspond to 4/3 Kievyan Street in Yerevan, Armenia, which investigators know to be KIRAKOSYAN's address.  This indicates that not only did KIRAKOSYAN take the

---

[19] I note that the FedEx shipping label lists a "ship date" of May 6, 2022.  Because the tracking information shows a shipment date of May 10, 2022, I believe that the shipping label reflects the date the shipping label was created. Based on my training and experience, it is common for shipping labels to be created on one date while the actual shipment takes place on another.  Also, May 6, 2022 was a Friday and May 10, 2022 was a Tuesday.  Prior to the shipment, a U.S. Company 1 employee who handled communications with KIRAKOSYAN told KIRAKOSYAN that the employee would be traveling until May 6 and thus KIRAKOSYAN would have to arrange pickup of the shipment from U.S. Company 1 before April 29 or on or after May 9.  That the shipment was physically sent on May 10 is thus consistent with the employee's communications with KIRAKOSYAN about shipment logistics.

photo, but that he had in his possession and had knowledge of the specific warning about U.S. export controls for U.S. Company 1's products.[20] [21]

53.     Also, the FedEx shipping label had notes regarding the contents of the shipment and whether an "EEI" was required:

```
REF:
DESC1:electronic items
DESC2:
DESC3:
DESC4:
EEI: NO EEI 30.37(a)
```

This section reflects that U.S. Company 1 incorrectly provided shipping information to FedEx, which represented that no EEI was required for this shipment based on the false information provided by KIRAKOSYAN, namely that the value of the shipment was under $2,500 and that no export license was required to the destination and end user.  Thus, KIRAKOSYAN caused the failure to file the EEI through the AES by providing false information and concealing the fact that the goods were intended for Russia.

54.     An investigator has obtained a contract dated April 26, 2022, that appears to be signed by KIRAKOSYAN and Russian Co-Conspirator 3 (on behalf of Vakuum) for the sale and transfer of the U.S. Company 1 product from KIRAKOSYAN to Vakuum.

---

[20] The label also stated that the declared cost of the goods was $2,316 and that the weight of the package was 5.8 kg. Investigators have reviewed the invoice for the transaction involving U.S. Company 1's Matrixx switch module, and the price is listed as $2,316, and the weight of the item is 13 pounds.  This corresponds to the information on the package label and shows that the package contained the controlled U.S. Company 1 item in question.

[21] The metadata for the photo of the shipping label indicates that the photo was taken on May 13, 2022.  It is possible that the shipment physically arrived in Armenia on Friday, May 13, 2022, and that FedEx did not record the delivery until May 17, 2022.  Because the item in question was controlled for export to Russia starting May 9, 2022, the difference in the dates is immaterial.

55.    Russian Co-Conspirator 1 also had in his possession an image of an invoice and payment instructions for a transaction between Vakuum and KIRAKOSYAN. The transaction was for $3,290, and the notes stated that it was for the "Matrixx Standard Switch Module." Russian Co-Conspirator 1 also possessed an image of wiring instructions dated May 3, 2022, for the transfer of funds from KIRAKOSYAN's Evocabank (Armenia) account to U.S. Company 1's Bank of America account.

56.    An investigator also acquired a packing list dated May 17, 2022, bearing KIRAKOSYAN's seal and what appears to be his signature for a shipment to Vakuum. The packing list shows the shipment of the U.S. Company 1 "Standard Switch Module: 4-HiPIMS." The price was listed as $3,290.

57.    Based on the totality of the evidence, I believe that this shows that KIRAKOSYAN shipped the goods from Armenia to Russia. It also shows that KIRAKOSYAN intentionally did not provide truthful information about the final end user of the goods with the purpose of evading U.S. export restrictions.

58.    BIS has confirmed that, starting on May 9, 2022, a license was required for export or reexport to Russia of the U.S. Company 1's Standard HiPIMS Switch-1 Input > 4 Outputs. An investigator has confirmed using reliable government databases that no BIS export license was obtained to export or reexport this item to Russia.

59.    Based on a review of email communications, I believe that the likely end user of this product was TsNIIKhM. The following communications show that TsNIIKhM was a possible intended end user of the Standard HiPIMS Switch-1 Input > 4 Outputs.

   a.    Agents have found a draft contract between Vakuum and the General Director of TsNIIKhM dated 2021 for the purchase of system with several

component products, including "one input and three independent outputs; works with the high voltage pulse generator HIPSTER 6 (manufacturer) Ionautics; allows power switching up to 1.5kW." The contract number was 32110711080_18804DON.

b.  On or about June 22, 2021, an employee of Vakuum contacted the previously-mentioned employee of U.S. Company 1 requesting to purchase a "HiPMS power switch to use Power Supply for three sputtering sources. (One input – three outputs)[.] We have HIPSTER 6 unit manufactured by Ionautics company. Specification is attached. The average power not more than 1.5kW." These specifications match those provided by TsNIIKhM. After some further discussions, U.S. Company 1 sent a quotation for the product on or about June 25, 2021.

c.  Agents also found what appears to be a tracking spreadsheet within the co-conspirators' accounts that links "Matrixx 4-HiPIMS" to contract number 32110711080_18804DON, indicating that the Matrixx switch was intended to satisfy the contract with TsNIIKhM.

d.  In late 2021, an employee of Vakuum sent a signed letter to TsNIIKhM requesting access to TsNIIKhM's premises from November 24 to December 30, 2021 for installation of equipment that included the equipment under contract number 32110711080_18804DON.

e.  Recall that Vakuum and U.S. Company 1 reached an agreement to purchase the product in December 2021.

*U.S. Company 2 Transaction*

60.    In mid to late-2023, KIRAKOSYAN and co-conspirators purchased evaporation pellets (which I understand are used in the research and testing of semiconductors) from U.S. Company 2.  KIRAKOSYAN, among other things, balked when asked to produce an end user statement attesting to the eventual consignee of the products.  Vakuum funded the transaction and was the true consignee of the shipment.  As Vakuum was by then an SDN, KIRAKOSYAN caused a violation of IEEPA by concealing Vakuum's role and thus causing U.S. Company 2 to engage in a transaction for or on behalf of an SDN without first obtaining the required OFAC license.

61.    On or about March 21, 2023, Russian Co-Conspirator 2 emailed Russian Co-Conspirator 1 and three employees of another Russian company stating: "Colleagues, there was a request from Baumanka.  The composition of the kit . . . Evaporation pellets, Al 99.999%, diameter ~ 1/4", length 1/2", 1kg . . . In2O3/PbO 90/10 wt% 99.99%, pieces ~ 1/4"-1/8", 0.5 kg . . . ."  Based on agents' discussions with experts knowledgeable in the field, investigators understand that these are specification for certain metals or alloys, including composition (*e.g.,* Al is aluminum and IN2O3/PbO refers to indium oxide/lead oxide), purity, size, and requested quantities.  Investigators also believe that "Baumanka" is a reference to Bauman State Technical University or "MSTU named after N.E. Baumann."  Investigators have learned based on open-source research that this is another name for Moscow State Technical University Named After N.E. Baumann.  This conclusion is bolstered by a previous email dated July 6, 2022 with subject line "MSTU Request for Precipitation Materials" in which an employee of this university emailed Russian Co-Conspirator 1 with the same specifications.  I understand "MSTU" to be an abbreviation for Moscow State Technical University.  The July 6, 2022 request came during

another 2022 transaction discussed below in which the Russian Co-Conspirators acquired sputtering targets from U.S. Company 2 for the university. Thus, I believe that Baumann State Technical University was the intended end user for the evaporation pellets purchases from U.S. Company 2.

62.    In summer 2023, U.S. Company 2 and KIRAKOSYAN reached an agreement for the purchase and shipment of evaporation pellets with these exact specifications to Armenia. In March 2023, U.S. Company 2 sent to KIRAKOSYAN a quotation for two products (totaling $1,870 with shipping). On May 5, 2023, KIRAKOSYAN sent a purchase order, and KIRAKOSYAN confirmed the transaction. Investigators have acquired a document with wire transfer instructions dated that same day reflecting the transfer of 236,000 Russian Rubles (or about $3,050 USD at prevailing exchange rates) from Vakuum to KIRAKOSYAN for the evaporation pellets.

63.    On June 1, 2023, KIRAKOSYAN sent the payment by wire to U.S. Company 2. The wiring instructions were from a bank in Yerevan, Armenia, and the beneficiary was U.S. Company 2 for $1,870. On June 15, 2023, U.S. Company 2 asked KIRAKOSYAN to complete an end user statement and sent to him a copy of BIS's standard Form 711. Among other things, Form 711 asks for the identity of the ultimate consignee and purchaser, and the signer is advised that "the making of any false statements or concealment of any material fact in connection with this statement may result in imprisonment or fine, or both and denial, in whole or in part, of participation in U.S. exports and reexports."

64.    On June 15, 2023, KIRAKOSYAN sent the end user statement request to Russian Co-Conspirators 1 and 2 stating, "[U.S. Company 2] requires an end user statement." Russian Co-Conspirator 2 wrote back, "Good afternoon, the end user can only be in Armenia after all.

You have a chance?"  And KIRAKOSYAN wrote back, "Unfortunately, no, since we are now very strict on these issues."  Russian Co-Conspirator 2 forwarded this email chain to Russian Co-Conspirator 1.  Russian Co-Conspirator 2 wrote back to KIRAKOSYAN (cc'ing Russian Co-Conspirator 1), "Since there is no one in Armenia to sign the [end user statement], then the money needs to be returned from the Americans."  This sequence shows KIRAKOSYAN was well aware of the significance of the end user statement and took direction from the Russian co-conspirators in the criminal enterprise.[22]

65.    On June 20, 2023, KIRAKOSYAN wrote back to U.S. Company 2: "if you are able to send the product without providing an 'end user statement,' then please send it.  If not, please transfer the money back to my account[.]"  U.S. Company 2 then indicated that there was some delay in manufacturing the product requiring a specification change to which KIRAKOSYAN responded: "I understand that you decided to send the goods?"  On June 23, 2023, KIRAKOSYAN sent this message to Russian Co-Conspirators 1 and 2 and stated, "Apparently the Americans decided to send the goods.  If possible, please clarify now are you satisfied with [the change in specifications]."  This indicates that KIRAKOSYAN was at all times acting at the direction of Russian Co-Conspirators 1 and 2.  U.S. Company 2 confirmed

---

[22] Russian Co-Conspirator 1 and 2 and Vakuum previously purchased items from U.S. Company 2 and then substituted KIRAKOSYAN as the purchaser.  For example, in June 2022, Russian Co-Conspirator 2 contacted U.S. Company 2 to claim he had "some contacts with a customer in Armenia a few months ago" and to ask whether U.S. Company 2 would have "any issues with shipping to Armenia[.]"  When U.S. Company 2 said that there were no issues with shipping to Armenia, Russian Co-Conspirator 2 emailed Russian Co-Conspirator 1 on June 17, 2022, a list of sputtering targets (similar to evaporation pellets) and the latter forwarded that to KIRAKOSYAN.  The email chain included the discussion about U.S. Company 2's ability to ship to Armenia.  Later that day, KIRAKOSYAN emailed U.S. Company 2: "My name is KAMO KIRAKOSYAN and I am from Armenia.  I am very happy to cooperate with you.  I need the following products."  KIRAKOSYAN copied and pasted the same list of products that he received from Russian Co-Conspirators 1 and 2.  KIRAKOSYAN did not include the Russian Co-Conspirators in his email to U.S. Company 2.  KIRAKOSYAN and Vakuum entered into a written contract signed by Russian Co-Conspirator 3 on July 7, 2022, for the sputtering targets purchased from U.S. Company 2.  Investigators have acquired a document dated July 7, 2022, with wiring instructions for a transfer from Vakuum to KIRAKOSYAN for the sputtering targets purchased from U.S. Company 2.  This sequence started the relationship between KIRAKOSYAN and U.S. Company 2 with the Russian Co-Conspirators communicating with KIRAKOSYAN in the background.

and, on June 23, 2023, KIRAKOSYAN agreed to consider a change in the specifications of the product to resolve the delay.  There were additional discussions about the specifications, and on June 29, 2023, U.S. Company 2 confirmed that the order would be set up and would get back to KIRAKOSYAN on a delivery time.  KIRAKOSYAN sent this confirmation to Russian Co-Conspirator 2 who then forwarded it to Russian Co-Conspirator 1. On June 29, 2023, Russian Co-Conspirator 2 told Russian Co-Conspirator 1, "[U.S. Company 2] agreed to ship Kamo without the [end user statement]."  Russian Co-Conspirator 1 replied, "they may ask for [the end user statement] before shipment" and suggested using another supplier.  Russian Co-Conspirator 1 commented that U.S. Company 2 agreed after the possibility of cancellation came up.  This is further evidence that the co-conspirators understood the significance of the end user statement and avoiding answering those questions truthfully.

66.    In August and September 2023, KIRAKOSYAN gave the Russian co-conspirators regular updates on delays in the shipment.  On or about September 20, 2023, U.S. Company 2 shipped the evaporation pellets to KIRAKOSYAN in Armenia.  On September 18, 2023, KIRAKOSYAN received an email from UPS notifying him that a parcel was on the way from U.S. Company 2 (the notification can be sent before a company tenders a package to UPS).  The next day, KIRAKOSYAN forwarded the UPS shipping information, including the tracking number, to Russian Co-Conspirator 2, who responded by thanking KIRAKOSYAN.  On September 24, 2023, KIRAKOSYAN received an email from UPS notifying him that the U.S. Company 2 shipment would be delivered on September 25, 2023.  KIRAKOSYAN thus kept the Russian Co-Conspirators apprised of the status of the shipment.

67.    Investigators reviewed a UPS shipment tracking document for the evaporation pellets, which revealed on September 25, 2023, the items were delivered to Armenia and received by "KAMO."  I believe that "KAMO" refers to Kamo KIRAKOSYAN.

68.    Based on the totality of evidence, KIRAKOSYAN conspired with others to violate IEEPA by concealing the role of Vakuum in the transaction.  By this time, Vakuum was an SDN and thus, a license from OFAC was required for U.S. Company 2 to transact business with Vakuum.  KIRAKOSYAN was a conduit for purchase orders and money between Vakuum and U.S. Company 2 and thereby caused a violation of IEEPA.  KIRAKOSYAN knew that this transaction was unlawful and conspired to evade U.S. law in his dealings with Vakuum.  An export license from BIS also was required to ship this item to Russia.

69.    Investigators have confirmed that KIRAKOSYAN, the Russian Co-Conspirators, and Vakuum did not obtain the required licenses from either OFAC or BIS.

***Attempted Violation of Export Control Laws and Additional Overt Acts in Furtherance of the Conspiracies: U.S. Company 3 Transaction***

70.    In August 2022, KIRAKOSYAN obtained and reexported electronic components manufactured by U.S. Company 3.  Investigators have obtained communications, including emails, detailing the transaction and the co-conspirators' use of Vakuum as a tool of the criminal enterprise.  Although U.S. Company 3's goods at issue were not controlled for export to Russia at the time of the shipment, these were overt acts in furtherance of the conspiracy because they establish the pattern and practice of KIRAKOSYAN substituting himself into deals with U.S. companies after additional export controls and sanctions were imposed on Russia in and after

February 2022, while concealing the role of the Russian Co-Conspirators and Vakuum as the real recipients of the shipments.

71.    On June 27, 2022, Russian Co-Conspirator 1 received an email from KIRAKOSYAN that forwarded an email chain involving an employee of U.S. Company 3.  The email traffic between Russian Co-Conspirator 1 and KIRAKOSYAN included the following:

  a.    On June 16, 2022, an associate of Russian Co-Conspirator 1 emailed a U.S. Company 3 employee, stating: "We need to buy some modules for [U.S. Company 3] PLC 5101 series.  Do you have a local representative in Armenia or in the Europe?"  The associate asked for quotes for specific products, a "K module" and an "F module."  He also asked whether U.S. Company 3 had a local representative in Armenia or in Europe.

  b.    On June 16, 2022, the U.S. Company 3 employee wrote back providing a price of $383.50 each for the "K module" and $348.10 for each "F module."  The employee attached a credit card form and wire information.

  c.    Russian Co-Conspirator 1's associate forwarded this email chain to Russian Co-Conspirator 1 and Russian Co-Conspirator 2 on June 17, 2022.  Russian Co-Conspirator 1 then wrote to KIRAKOSYAN and Russian Co-Conspirator 2 (who was listed as using an email address whose domain was that of Vakuum): "Dear Kamo.  There is still interest to buy from the seller below" and listed the goods as the "5100-K" for $383.50 USD and "5100-F" for $348.10 USD.  Both are U.S. Company 3 products.

d.  On June 22, 2022, Russian Co-Conspirator 1 followed up with an email to
KIRAKOSYAN stating: "For the positions below, is it possible to buy through
you?"

72.    KIRAKOSYAN wrote back to Russian Co-Conspirator 1 on June 27, 2022, with a
shipping quote.  The total cost of goods was listed as $1,080.  He noted that the shipping cost
from the United States to Yerevan, Armenia would be $140 with 4-8 business day FedEx
delivery.  He then quoted shipping from Yerevan, Armenia to Moscow, Russia at $60 with 2-6
business days using a business called "CDEK."  Based on open-source information, CDEK
appears to be an express delivery company based in or doing business in Russia.  He also quoted
customs costs and "intermediary costs" that totaled $490.  The total price for shipment from the
United States to Russia through Armenia was $1,770.

73.    Later that day on June 27, 2022, Russian Co-Conspirator 1 wrote back to
KIRAKOSYAN: "Dear Kamo.  We are satisfied.  Thank you.  We buy."  And Russian Co-
Conspirator 1 directed Russian Co-Conspirator 3 to "make a purchase."  Finally,
KIRAKOSYAN wrote back: "I'll send an invoice tomorrow."

74.    Russian Co-Conspirator 1 also possessed a proforma invoice dated June 17, 2022,
from U.S. Company 3 to KIRAKOSYAN for the two modules described above with a quoted
price of $1,079.70 total.  This indicates that Russian Co-Conspirator 1 was fully aware of the
transaction and its terms and had the authority to approve the transaction.

75.    Investigators have spoken with a representative of U.S. Company 3, who
confirmed that the parts in question were in fact shipped to Armenia as reflected in the shipping
label information further below.  Additionally, investigators have been provided shipping
records, including a FedEx delivery confirmation for August 19, 2022, showing delivery in

31

Yerevan, Armenia.[23]  And agents have acquired an CDEK shipping label dated August 19, 2022, from KIRAKOSYAN in Yerevan, Armenia to Vakuum in Zelenograd, Russia.  Thus, the evidence shows that KIRAKOSYAN almost immediately transshipped the U.S. Company 3 products to Russia.

76.    As described above, by this point, KIRAKOSYAN had engaged in additional transactions on behalf of the conspiracy in which he was used as the nominal end user while shipping the goods to Russia.  He had knowledge of U.S. export control laws and understood that he had to make the purchases instead of those purchases coming from Vakuum directly in order to evade U.S. export controls.  This is further evidence he acted willfully during the conspiracies.

77.    Additionally, within one of KIRAKOSYAN's electronic accounts, investigators found a document titled "FedEx Shipping Label" that was sent to KIRAKOSYAN by a U.S. Company 3 employee.  It pertains a shipment dated July 28, 2022, from U.S. Company 3 to KIRAKOSYAN, and the customs value is listed as $1,079.  It is thus for the shipment at issue here.  The label contained the following warning about U.S. export controls on the front:

These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations.

---

[23] On August 17, 2022, KIRAKOSYAN wrote to a U.S. Company 3 employee to convey that "the goods are already in Yerevan, thank you for your cooperation.  I also ask you to send a COMMERCIAL INVOICE to [an email address] (Armenian customs email), and a copy to me."  Based on the context, it appears that the shipment may have arrived in Armenia by August 17, 2022, and then it took time to pass through customs.

78.     Based on publicly available data sheets, Investigators have learned that U.S. Company 3's 5100-K is an analog combo input/output control module, and its 5100-F is an analog input module.  According to U.S. Company 3, they are electronic PC boards that convert low level analog signals for use in our automation controllers.  These modules plug into U.S. Company 3 automation controllers that are typically used to control any type of automated machinery or process in the industrial and manufacturing sectors.

***Additional Overt Acts in Furtherance of the Conspiracies: Attempted Transaction with U.S. Company 4***

79.     In April 2022, the Russian Co-Conspirators attempted to purchase semiconductor manufacturing equipment from a company based in Austin, Texas.  When advised that export licenses and end user statements would be required to ship to Russia, they backed away from the transactions and then attempted to ship certain items to Armenia.  This pattern of activity indicates this attempt was in furtherance of the conspiracy.

80.     On April 19, 2022, Russian Co-Conspirator 1 and Russian Co-Conspirator 2 sent an email to an employee of a shipper/freight forwarder based in New York.  The email indicated that Russian Co-Conspirator 1 would be signing a contract with U.S. Company 4.  He further indicated that the contract would be for two systems "like shown below . . . ."  As discussed below, this communication was about two U.S. Company 4 LSC-4000 devices.  The email included a string of other emails dating back to mid-2020 that help explain what Russian Co-Conspirator 1 was referring to:

a.   In January 2020, Russian Co-Conspirator 1 and an employee of the shipper/freight forwarded discussed shipping products from the United States to Malberg, Ltd.[24]

b.   In the email thread, the shipping company employee repeatedly referred to customs declarations, the need to specify the end-user of the product, and other customs/export control requirements, establishing that Russian Co-Conspirator 1 was aware of these legal requirements under United States law.

c.   In the April 2022 email, Russian Co-Conspirator 1 specified that he intended to ship a U.S. Company 4 LSC-4000 cleaning system but did not specify to where. Investigators learned that an LSC-4000 is a "Large Substrate Cleaner" that U.S. Company 4 sells as a standalone cleaner used in, among other applications, the manufacture of silicon on sapphire semiconductor wafers, semiconductors, and display panels.

81.   On February 25, 2022, Russian Co-Conspirator 1 emailed U.S. Company 4 employees to inquire "how sanctions can influence our ongoing projects . . . 2xLSC, SW3000 U1 . . . if necessary maybe we can cancel order for 2xLSC and maybe new order will immediately come from not Russia place[.]"  U.S. Company 4's CEO responded that day: "In our shipments what matters is the ultimate end user, so your suggestion would not work, but maybe things improve."

---

[24] Malberg, Ltd. was sanctioned by OFAC on March 31, 2022, for being owned or controlled by, or for having acted or purporting to act for or on behalf of, directly or indirectly, the Government of the Russian Federation, thereby requiring a license from OFAC to engage in transactions subject to U.S. jurisdiction with limited exceptions. Malberg, Ltd. also was added to BIS's Entity List effective March 3, 2022, thereby requiring an export license for all items subject to the EAR with a policy of denial.

82.    Based on numerous communications recovered from the co-conspirators'
accounts, it appears that Vakuum was working with multiple potential end users for U.S.
Company 4's products.

      a.    On February 28, 2022, Russian Co-Conspirator 1 corresponded with unknown
         individuals who appear to indicate that the end user for U.S. Company 4's
         products may be an entity of the Russian Academy of Sciences.

      b.    Another possible end user for the SWC-3000 was MPI Volna.  On March 24,
         2021, an individual listing herself as the "Deputy Head of the Devices Import
         Group, MPI Volna" asked Russian Co-Conspirator 1 for a proposal for the
         acquisition of the SWC-3000 and attached the specifications for the device.  On
         December 15, 2021, Russian Co-Conspirator 1 asked the MPI Volna employee
         whether there was any news on the purchase of the SWC-3000.  She responded
         that it was budgeted for the next year (2022).  On January 12, 2022, Russian Co-
         Conspirator 1 followed up, asking "What about SWC3000—determined?"  On
         January 18, 2022, she responded "Hello [Russian Co-Conspirator 1]!  The
         SWC3000 software—the hardware is in the plan for this as soon as it allocates
         money—we will purchase.  They said that the beginning of the year.  Does the
         manufacturer raise prices?"

83.    That day, a U.S. Company 4 employee emailed Russian Co-Conspirator 1: "I just
spoke to the US Department of Commerce and they told me I have to submit an Export License
Request but based on what I said we should not have any issues exporting the cleaners" and
asking for end user information.  Russian Co-Conspirator 1 and U.S. Company 4 employees

appear to have had further discussions, including in a Zoom meeting that was scheduled for March 2, 2022, but to my knowledge, the transaction was not completed.

84.    In addition, on April 10, 2022, Russian Co-Conspirator 1 inquired via email about U.S. Company 4 sending a product to a company called Crocus in Russia.[25] A U.S. Company 4 employee indicated that an export license would be required. Russian Co-Conspirator 1 eventually did not pursue the purchase and indicated that Crocus was sanctioned by the United States government. This email further shows that Russian Co-Conspirator 1 was aware of restrictions on the export of United States-origin goods and technology to Russia and on transactions with sanctioned persons.

85.    On April 19, 2022, Russian Co-Conspirator 1 emailed the CEO of U.S. Company 4 and another U.S. Company 4 employee stating, "we have a customer in Armenia for SW3000. Due to it being out of any sanctions I hope it will not be a problem to supply?" Based on my understanding of U.S. Company 4's focus on semiconductor manufacturing equipment, I believe Russian Co-Conspirator 1 was referring to a SWC 3000, which is a "single-wafer cleaning" system that is used to clean and process semiconductor wafers. That day, the CEO of U.S. Company 4 wrote: "Yes we can deliver SWC-3000 to Armenia, please provide the specification and application for example wafer and/or mask sizes CMP or resist residue removal, etc." On August 3, 2022, Russian Co-Conspirator 1 emailed the CEO of U.S. Company 4 and wrote: "[T]hat project looks actual again. Due to lack of experience they asked us what configuration to buy." The CEO of U.S. Company 4 wrote back on August 6, 2022: "Please find our quote is attached. Also please provide the end user information." Investigators have not found evidence

---

[25] BIS added Crocus Nano Electronics to its Entity List on March 3, 2022, and OFAC added it to its SDN List on September 15, 2022.

that Russian Co-Conspirator 1 sent the end user information to U.S. Company 4.  Russian Co-Conspirator 1 forwarded this email to an unknown individual in October 2022, but it appears this transaction was not completed.  I believe that this email chain indicates that Russian Co-Conspirator 1 was attempting to acquire U.S.-origin semiconductor manufacturing equipment for transshipment through Armenia to Russia, based on Russian Co-Conspirator 1's pattern and practice of transshipping U.S.-origin items through Armenia to Russia after Russia's invasion of Ukraine in February 2022.

86.    The Commerce Department has confirmed that the Single Wafer Cleaner (SWC) 3000 and the Large Substrate Cleaner (LSC) 4000 were not controlled for export to Russia in April 2022.  However, based on communications with U.S. Company 4 employees, Russian Co-Conspirator 1 believed that a license was required for export to Russia for these products, did not proceed with the transaction, and then proposed an Armenian substitute in April 2022 – essentially the same pattern of end user substitution and transshipment through Armenia as the other transactions outlined above.  Thus, Russian Co-Conspirator 1's attempt to obtain U.S. Company 4's products through April 2022 constitute overt acts in the Western District of Texas in furtherance of the overall conspiracies.

***Additional Overt Acts in Furtherance of the Conspiracies: VNIIA Transaction***

87.    In August 2022, VNIIA sought to obtain an Elmo Rietschle side channel blower. Russian Co-Conspirator 1 tasked KIRAKOSYAN with acquiring this part for shipment to Armenia, thereby not disclosing to the seller the involvement of any Russian entities.  As described further below, KIRAKOSYAN secured the good from German Company 1 and shipped it from Germany to Russia via Armenia in December 2022.  In furtherance of the criminal enterprise, Russian Co-Conspirator 1 supervised and approved KIRAKOSYAN's

purchase of the side channel blower.  Vakuum paid KIRAKOSYAN for the shipment.  The evidence indicates the good was actually sent to Russia.

88.    On August 7, 2022, a representative of VNIIA contacted Russian scientific and engineering company based in Moscow with a request to purchase an Elmo Rietschle G-BH100 2BH100-1AB32 24V DC side channel blower.  The VNIIA request also listed an IDT-001 Display Terminal with 3m and an STP-Link Cable (3M) with Software.  On August 8, 2022, an employee of the scientific and engineering company sent the request to Russian Co-Conspirator 1 and Vakuum.  That day, an employee of Vakuum emailed Russian Co-Conspirator 1 with a note about procuring either an Elmo Rietschle G-BH100 2BH100-1AB32 24V DC side channel blower or an Elmo Rietschle G-BH100 2BH100-0AB32 24V DC side channel blower, stating that the only difference in the parts is types of pipes they will fit.  The email also contained links to specific suppliers, including German Company 1.  On that date, Russian Co-Conspirator 1 emailed KIRAKOSYAN: "Dear Kamo! Please request the possibility of supplying 2 pcs. pumps from the letter below."

89.    On August 8, 2022, KIRAKOSYAN emailed Germany Company 1, stating: "My name is Kamo Kirakosyan, I am from Armenia.  I am very happy to cooperate with you.  We are interested to purchase the following product: Elmo Rietschle G-BH100 2BH1002-1AB32 24V or 1BH1002-0AB32 – 2(two) pcs.  We are ready to pay 100% equipment costs in advance, in case of acceptable."  KIRAKOSYAN then provided his address and contact information.

90.    On October 4, 2022, German Company 1 responded with an offer about the 2BH1002-0AB32 and the product data sheet.  The offer number was 220880.  That day, KIRAKOSYAN responded: "I am ready to buy 1 (one) pieces of 'Side Channel Blower 2BH10020AB32 24V'.  Please provide proforma invoice, shipping costs to Yerevan and HS

product code."  Again, that same day, German Company 1 sent KIRAKOSYAN an offer for a

"Side Channel Blower 2BH10020AB32 24 V" with "Item No. 2BH10020AB32" with a price of

994.56 EUR.

91.     On October 6, 2022, KIRAKOSYAN sent detailed terms for the shipment of the

product to Russian Co-Conspirator 1.  The terms confirmed the price (994.56 EUR) for offer

number 220880 (the same number as in Germany Company 1's offer), that the cost of transport

from Germany to Yerevan, Armenia would be 170 EUR, that shipment from Yerevan to Moscow

via a Russian shipping company would be 70 EUR with 2-6 day transit time, that customs

expenses (clearance, broker, warehouse) would be 120 EUR, a "permit 'dual-use goods'" would

be 160 EUR, and that intermediation costs would be 345 EUR.  The total cost was listed as 1860

EUR.  Russian Co-Conspirator 1 responded on that date: "Everything is ok. [Russian Co-

Conspirator 3], please purchase."  Russian Co-Conspirator 3 then wrote to KIRAKOSYAN:

"Please send the contract and invoice for payment."  On October 7, 2022, KIRAKOSYAN

prepared an invoice to Vakuum for the transaction.  It listed the price as 1860 EUR.

KIRAKOSYAN used Armenian bank Evocabank with Raiffeisen Bank in Vienna, Austria as the

intermediary bank.

92.     On November 16, 2022, an employee of Germany Company 1 sent to

KIRAKOSYAN Invoice No. RE-2201706.  The relevant information in the invoice was as

follows and included both the country of origin (Germany) and the HS code (84141089).  With

shipping and packing costs, the total amount of the invoice was 1,149.48 EUR.

| Pos. Items | Quantity | U-Price | p.Unit | VAT | Total |
|---|---|---|---|---|---|
| Our Order No.:: 2201672 | | | | | |
| Delivery Note No. LS-2201702 - 16.11.2022 | | | | | |
| Your Order number: Mail Best.Datum: 06.10.2022 | | | | | |
| Customer reference: offer no. 220880 | | | | | |
| 10  2BH10020AB32 | 1 Pce | 994,56 EUR | 1 | 0% | 994,56 EUR |
| G-BH10 Gasringverdichter 24V | | | | | |
| This article is RoHS-compliant | | | | | |

| | | |
|---|---|---|
| Voltage | : | 24V DC |
| Functionality | : | vacuum and pressure |
| Medium | : | air |
| Engine power | : | 90 Watt |
| Revolutions per minute | : | 9000 min |
| Current Consumption | : | 4,5 A |
| Noise Level | : | 48 dB (A) |
| Motor type of protection | : | IP66 |
| Electronics | : | integrated |
| Connection type | : | Hose connection |
| Weight | : | 1,2 kg |

**Customs tariff number:** 84141089

**Country of orisgn:** Federal Republic of Germany

************************************************************

**Zolltarifnummer:** 84141089

**Ursprungsland:** Deutschland

| | | |
|---|---|---|
| **Anzahl und Art der Packstücke:** | 1 Karton(s) | |
| | 0 Palette(n) | |

**Maße:** 37,50 x 26,00 x 16,50 cm

| | Subtotal | 994,56 EUR |
|---|---|---|

93.    On December 23, 2022, Russian Co-Conspirator 3 emailed KIRAKOSYAN:
"Dear Kamo!  We received the goods, documents included."  On January 10, 2023, Russian Co-
Conspirator 3 followed up, writing, "Dear Kamo! . . . Tell me, what country of origin of the
product: Side Channel Blower 2BH10020AB32 24V".  KIRAKOSYAN wrote back to confirm
that the country of origin is Germany.

94.    Based on the facts set forth above, the evidence shows that Russian Co-
Conspirator 1 and Vakuum used KIRAKOSYAN to procure a side channel blower from
Germany for export to Russia through Armenia.  The intended end user for that product was
VNIIA, a sanctioned entity under European Union and German law.[26]  This activity was part of
the same overall criminal conspiracy to obtain goods for sanctioned Russian entities.

---

[26] If this were a U.S.-origin item, a license would have been required by BIS to export or reexport it to VNIIA.
OFAC also designated VNIIA to the SDN List on February 24, 2023.

*Additional Evidence of KIRAKOSYAN's Willfulness*

95.     Investigators have uncovered several communications showing that the key members of the conspiracy knew about U.S. sanctions and export control laws and willfully formed a criminal enterprise and conspiracy designed to evade and defeat those laws.

96.     For example, Russian Co-Conspirator 1 and Vakuum had potential ties to, among other things, the Russian nuclear industry and weapons industry.  On November 22, 2021, VNIIA sent what investigators believe to be a request for quotes or supply to Vakuum.  The document asked whether Vakuum would be able to supply, among other things, technologies related to superconductors and plasma etching.  Notably, the document stated: "We also draw your attention to the fact that [the Institute] is included in the United States of America sanctions list (Federal Register 85 FR 83799 12/23/2020)."  Among other things, this document indicates specific knowledge of U.S. sanctions and export control laws by Russian Co-Conspirator 1 and others.

97.     KIRAKOSYAN also informed Russian Co-Conspirator 1 of ways to evade U.S. sanctions laws.  On May 24, 2022, he sent Russian Co-Conspirator 1 instructions or information on opening a bank account in Armenia.  KIRAKOSYAN noted: "For Russians under sanctions, opening an account in an Armenian bank is one of the opportunities to return to work with foreign clients, receive payment at an adequate rate, and use international services."

98.     In March 2022, U.S. Company 1 employees asked KIRAKOSYAN for end user information.  KIRAKOSYAN turned to Russian Co-Conspirator 1 to collude on the answers and Russian Co-Conspirator 1 told KIRAKOSYAN: "It will be on your behalf [referencing KIRAKOSYAN].  This is a small thing.  I think no one will pay attention to him.  He [referencing the U.S. Company 1 employee] needs it to report that he is doing everything

legally." This email indicates that KIRAKOSYAN would falsely claim to be the end user when, in fact, the true end user for the good was in Russia.

99. On March 1, 2023, Russian Co-Conspirator 1 emailed the CEO and another employee of U.S. Company 4 to notify them that Vakuum had been "added to SDN sanction list" and included a link to OFAC's public announcement. This led U.S. Company 4 to cancel its contract with Vakuum. Russian Co-Conspirator 1 referred to the SDN listing as "force majeure" for contract cancellation purposes. This shows that Russian Co-Conspirator 1 was well aware of Vakuum's SDN listing and the consequences of the listing.

***Evidence of the Criminal Enterprise***

100. The evidence shows that the co-conspirators engaged in a joint criminal enterprise to violate U.S. export control laws.

101. First, they used Vakuum extensively. Vakuum is a business in Zelenograd, Russia with employees, its own email domain, and a business address. It was used repeatedly to make payments to, among others, KIRAKOSYAN, receive goods illegally, and has been sanctioned by the U.S. government. The co-conspirators used Vakuum to obtain U.S.-origin goods even after it was added to the OFAC SDN list.

102. Second, KIRAKOSYAN took direction from Russian Co-Conspirator 1, Russian Co-Conspirator 2, and worked with Russian Co-Conspirator 3. The Russian individuals gave KIRAKOSYAN direction on what products to purchase. When it came time to approve a transaction, KIRAKOSYAN sent transaction details to, among others, Russian Co-Conspirator 1 who approved the transaction and pricing details and sometimes instructed Russian Co-Conspirator 3 to conclude the deal with KIRAKOSYAN.

103.    Third, there is evidence of specific contracts entered into between KIRAKOSYAN and Vakuum.  As noted above, they entered a contract for the transfer of the U.S. Company 1's products in April 2022.  They also entered into a contract for the transfer of U.S. Company 3's products in July 2022.  Coupled with repeat evidence of payments from the Russian Co-Conspirators and Vakuum to KIRAKOSYAN, this shows that KIRAKOSYAN was working for and on behalf of Vakuum, Russian Co-Conspirator 1, and others.

104.    Fourth, there is significant evidence that Vakuum was otherwise used to supply sanctioned Russian government entities, nuclear industry and semiconductor companies, and research institutions.  Because Russian Co-Conspirator 3 appears to have had an administrative function at Vakuum, a significant portion of the relevant communications flowed through her.

a.    On October 24, 2023, Russian Co-Conspirator 3 received an email from an individual who identified herself as a "Leading Procurement Specialist OMTS IAF SO RAS" in Novosibirsk Russia.  The domain for the sender's email account was inp.nsk.su, which investigators have learned from open-source research is the domain for the Budker Institute of Nuclear Physics in Novosibirsk, Russia.  Investigators have also learned that .su is the top-level domain once assigned to the Soviet Union.  The sender also listed her business address as a location in Novosibirsk, Russia that is also associated with that institute.  The email stated "We would like to inform you that the tester did not go into normal operation mode on October 23, 2023, and generated error code 16.  Please repair the defects of the goods, restore their workability within 10 days or replace the inferior goods."  The email then cited a December 22, 2022, contract apparently between

Vakuum and the institute.    This is further evidence that Vakuum is used broadly to procure technical goods for sanctioned Russian entities.

b.  On or about October 10, 2023, Russian Co-Conspirator 3 received an email at a Vakuum email account from an individual identifying themselves as an employee of the Bauman State Technical University or "MSTU named after N.E. Baumann."    In the email, it appears that Russian Co-Conspirator 3 was notified of a penalty or breach of contract claim, which indicates that Russian Co-Conspirator 3 and Vakuum had an existing procurement contract with the university.

c.  On or about October 5, 2023, Russian Co-Conspirator 3 received an email from an individual who worked at "JSC NIIEFA" with an email domain of nieefa.spb.su.  Based on open-source research, investigators have learned this refers to JSC "NIIEFA" or the D.V. Efremov Institute of Electrophysical Apparatus.  The institute indicates it works on the design and manufacturing of particle accelerators.  Additional open-source research indicates that it is an enterprise of the Russian state atomic energy corporation Rosatom.  The email appears to ask for a quote for output controllers for some kind of pump.  Although this institute is not itself sanctioned, the email indicates that Russian Co-Conspirator 3 and Vakuum were in the business of procuring goods for an entity closely associated with the Russian nuclear program and industry.

d.  On September 7, 2023, Russian Co-Conspirator 3 received an email from an individual employed by NM-Tekh.  The email contained a solicitation for the supply of "parts for liquid chemical treatment plants at the section of liquid

etching and laundering."  The sender followed up on September 18, 2023, asking

whether Russian Co-Conspirator 3 planned to send a proposal for the request, and

she forwarded the email to Russian Co-Conspirator 2 that day.

e.  Investigators have also acquired a document relating to Vakuum that appears to

be dated September 2023 that is a bid to supply ZNTC with an "Emission Line

Analyzing Spectrometer" manufactured by a German company.  Russian Co-

Conspirator 3 appears to have signed the document for Vakuum.  This indicates

that the conspirators are actively participating in Vakuum's efforts to source

Western parts for import into Russia from European sources as well as U.S.

manufacturers.  That Russian Co-Conspirator 3 signed the bid is also consistent

with the joint criminal enterprise's practices as she also signed the contract with

KIRAKOSYAN as set forth above.

105.    In totality, the evidence indicates that Russian Co-Conspirators 1-3, and

KIRAKOSYAN were in a joint criminal enterprise that, among other things, used Vakuum to

evade Western and U.S. export controls and sanctions against Russia, and falsely claim that

controlled U.S.-origin goods were intended for Armenia when in fact they were transshipped to

Russia.

## **CONCLUSION**

106.    Based on the facts set forth above, I submit there is probable cause to believe that

KIRAKOSYAN has committed the subject offenses within the Western District of Texas and

elsewhere and that a warrant should issue for his arrest.

Respectfully submitted,

*William Moulds*

William Clarence Moulds
Special Agent
Department of Commerce, Bureau of
Industry and Security

Subscribed and sworn to me via telephone pursuant to Federal Rule of Criminal

Procedure 4.1 on September ____5____, 2024.

DUSTIN M. HOWELL
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF TEXAS

46