FILED
August 05, 2025
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: VAR
DEPUTY

**SEALED**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

**UNITED STATES OF AMERICA**
**Plaintiff**

**v**

**(1)** [redacted]
**(2) KAMO KIRAKOSYAN**
**Defendants**

**1:25-CR-00366-ADA**

**INDICTMENT**

**[Ct. 1: 18 U.S.C. § 371 – Conspiracy to Violate Federal Law;**
**Ct. 2: 18 U.S.C. § 371 – Conspiracy to Defraud the United States;**
**Ct. 3: 50 U.S.C. § 4819(a)(2)(C) – Attempted Violation of the Export Control Reform Act;**
**Ct. 4: 18 U.S.C. § 554(a) – Attempted Smuggling;**
**Ct. 5: 50 U.S.C. § 4819(a)(1)) –Violation of the Export Control Reform Act;**
**Ct. 6: 18 U.S.C. §§ 554(a) & 2 – Smuggling]**

**THE GRAND JURY CHARGES:**

At All Times Material To This Indictment:

## SUMMARY

1. As described in detail below, Defendants [redacted], **KAMO KIRAKOSYAN**, and others participated in a criminal conspiracy to export goods from the United States to the Russian Federation through the Republic of Armenia without the requisite license or authorization from the U.S. government.

## DEFENDANTS AND ENTITIES

2. Joint Stock Company **VAKUUM.ru** ("**VAKUUM**") was a business based in Russia. On February 24, 2023, the Department of the Treasury, Office of Foreign Assets Control

("OFAC") designated **VAKUUM** on the Specially Designated Nationals ("SDN") List, subjecting the Russian company to U.S. blocking sanctions and a general prohibition on transacting with U.S. persons or entities. OFAC designated this Russia-based company, which specializes in the sale of manufacturing and technological equipment to Russia-based customers, for working with the Russian intelligence-linked procurement network of the U.S.-sanctioned entity Malberg Ltd. to obtain advanced equipment with applications in the microelectronics and quantum industries.

3. [redacted] was a resident and citizen of Russia. He was a director of **VAKUUM**, which was a Russian company used by the co-conspirators to illegally obtain U.S.-origin goods.

4. **KAMO KIRAKOSYAN** was a resident and citizen of Armenia.

5. **Unindicted Co-Conspirator 1**, whose identity is known to the Grand Jury, was an employee of **VAKUUM**.

6. **Unindicted Co-Conspirator 2**, whose identity is known to the Grand Jury, was an employee of **VAKUUM** who held herself out as the "General Director" of **VAKUUM**.

7. **U.S. Company 1**, whose identity is known to the Grand Jury, was a company based in Danbury, Connecticut, United States that was a global supplier of high power radio frequency ("RF") generators, high voltage direct current ("DC") plasma generators, microwave power system products, and plasma processing tools specifically designed for industrial and scientific applications.

8. **U.S. Company 2**, whose identity is known to the Grand Jury, was a company based in San Jose, California, United States that, among other things, manufactured sputtering targets and evaporation pellets and produced custom alloys and high purity metals.

9. **U.S. Company 3**, whose identity is known to the Grand Jury, was a company based in Austin, Texas, United States that, among other things, designed, developed, and manufactured single wafer-thin film processing systems that had applications in, among other things, semiconductor manufacturing.

## OVERVIEW OF THE CRIMINAL SCHEME

10. Beginning on or about February 24, 2022, and continuing until at least August 2024, [redacted], **KIRAKOSYAN**, **Unindicted Co-Conspirator 1**, and **Unindicted Co-Conspirator 2**, together with others, and utilizing **VAKUUM**, engaged in a conspiracy to violate U.S. export control and sanctions laws and defraud the United States. Additionally, the members of the conspiracy illegally exported and reexported certain goods from the United States to Russia through Armenia, and attempted such acts, without the required licenses from the Department of Commerce, Bureau of Industry & Security. The members of the conspiracy also violated the International Emergency Economic Powers Act ("IEEPA") by engaging in transactions with and for the benefit of one or more entities on the SDN List without the required licenses from OFAC.

11. The unlawful transactions involved **U.S. Companies 1**, **2**, and **3**, among others. The members of the conspiracy used **VAKUUM** as a tool to make payments, receive goods, and coordinate criminal activity. The conspiracy also involved engaging in transactions with and on behalf of sanctioned entities in Russia, including the recipients and end users of the U.S.-origin goods.

12. **KIRAKOSYAN** became the straw or substitute purchaser of U.S.-origin goods for [redacted], **Unindicted Co-Conspirator 1**, and **Unindicted Co-Conspirator 2** shortly after Russia's full-scale invasion of Ukraine on February 24, 2022, and the imposition of additional

sanctions and export restrictions on Russia. In May 2022, he sent to [redacted] instructions on opening a bank account in Armenia for the purpose of evading sanctions. Unbeknown to the U.S. Companies, [redacted] and the Unindicted Co-Conspirators communicated with **KIRAKOSYAN** separately and instructed him regarding potential transactions, paid him for goods, and had him arrange the transshipment of goods to Russia through Armenia while **KIRAKOSYAN** represented himself to the U.S. Companies as the Armenian buyer of the goods. One or more U.S. companies asked **KIRAKOSYAN** for end user statements (documents requiring a purchaser to specify the ultimate consignee of a good), and, together with the other members of the conspiracy, he did not provide truthful information about the end users. U.S. companies specifically informed **KIRAKOSYAN** that certain shipments contained controlled U.S.-origin goods, whose unauthorized export or reexport to Russia was prohibited; **KIRAKOSYAN** nonetheless sent the goods from Armenia to Russia after receiving them from the United States.

## OBJECTS OF THE CONSPIRACY

13. The objects of the conspiracy were:

a. to acquire goods from the United States for export and reexport to Russia via Armenia;

b. to conceal from U.S. companies that the goods were destined for Russia and Russian end users;

c. to evade export control and sanctions regulations, prohibitions, and licensing requirements; and

d. to conceal prohibited activities from detection by the U.S. government so as to avoid penalties and disruption of illegal activities.

## MANNER AND MEANS OF THE CONSPIRACY

14. The manner and means by which the members of the conspiracy sought to accomplish the objects of the conspiracy included, among others, the following:

a. the members of the conspiracy planned and acted both inside and outside the United States to acquire goods for export or reexport to Russia;

b. the members of the conspiracy used email and communications platforms to communicate with one another and with other individuals, including individuals located in the United States, Russia, and Armenia;

c. the members of the conspiracy intentionally concealed from the U.S. government and companies located in the United States the true nature of the ultimate destination country and end users of the goods by providing false and misleading information to or causing false and misleading information to be provided to the U.S. government and U.S. companies;

d. the members of the conspiracy used **VAKUUM** as a tool to make payments, receive goods, and coordinate criminal activity; and

e. the members of the conspiracy caused and attempted to cause goods to be exported from the United States to Russia through a third country without obtaining the required license or approval from the U.S. government.

## OVERT ACTS AND SIGNIFICANT EVENTS

### A. U.S. Company 1 Transaction

15. In or about December 2021, **VAKUUM** reached an agreement with **U.S. Company 1** to purchase a product described as a "Matrixx Switch Module." After additional U.S. sanctions and export restrictions were imposed on Russia, in or about March 2022, **VAKUUM** and

[redacted] backed out of the deal and enlisted **KIRAKOSYAN** to serve as their straw or substitute purchaser. On or about March 22, 2022, **KIRAKOSYAN** stepped in to obtain the goods from **U.S. Company 1** for shipment to Russia via Armenia on behalf of **VAKUUM** and [redacted].

16. On or about December 7, 2021, **Unindicted Co-Conspirator 1** emailed two employees of **VAKUUM** and an employee of **U.S. Company 1** with instructions to place an order for the **U.S. Company 1**'s Matrixx products. The purchase price, with a 10% discount for **VAKUUM**, was $2,316.60.

17. On or about February 24, 2022, the **U.S. Company 1** employee emailed **Unindicted Co-Conspirator 1** to state that the order was complete and packaged and sent the FedEx shipping pricing. Over the next few days, **U.S. Company 1** and **Unindicted Co-Conspirator 1** continued to discuss the logistics of the transaction and shipment.

18. On or about March 2, 2022, the **VAKUUM** employee informed the **U.S. Company 1** employee that **VAKUUM** had made the payment, which **U.S. Company 1** confirmed two days later. Then, on or about March 11, 2022, the **VAKUUM** employee emailed the **U.S. Company 1** employee to indicate that **VAKUUM** would attempt to arrange shipment but "now we have some issues with it" and it could take some time.

19. On or about the same day, the **U.S. Company 1** employee replied and stated that he had "received an email from a German person asking for a quote on a switch with the same specifications – with a shipment to Armenia. Is this request – somehow – connected to your order?" On or about March 29, 2022, [redacted] entered the conversation and wrote to the **U.S. Company 1** employee: "We recheck that request from Armenia – it is from our end-user. Because

he cannot buy through us now, he asked his friends in Europe. Please ship our package to him and when he will pay 100% please return our payment back."

20. While **VAKUUM** and [redacted] were communicating with the **U.S. Company 1** employee in mid- to late-March 2022, [redacted] and **KIRAKOSYAN** were separately discussing sending the goods to Armenia and then to Russia. On or about March 22, 2022, **KIRAKOSYAN** emailed **U.S. Company 1** to purchase the same goods **VAKUUM** was attempting to purchase. The same **U.S. Company 1** employee who dealt with **VAKUUM** wrote to **KIRAKOSYAN** with pricing for Matrixx Switch Modules for $2,316. The **U.S. Company 1** employee asked, "Who is the customer?" and "What is the customer's address?"

21. On or about March 24, 2022, **KIRAKOSYAN** forwarded his communications with **U.S. Company 1** to [redacted]. On or about April 7, 2022, **U.S. Company 1** again sent shipment and payment details to **KIRAKOSYAN** and asked for "complete information regarding the customer (end user) in Armenia" including business name, contact name, email addresses, and telephone number together with a "written purchase order from the company in Armenia." **KIRAKOSYAN** again forwarded this email to [redacted]. On or about April 7, 2022, [redacted] wrote to **KIRAKOSYAN** requesting information for a contact in Armenia and a written purchase order from the company in Armenia. [redacted]: "It will be on your behalf [referencing **KIRAKOSYAN**]. This is a small thing. I think no one will pay attention to him. He [referencing the **U.S. Company 1** employee] needs it to report that he is doing everything legally."

22. On or about April 25, 2022, **U.S. Company 1** sent **KIRAKOSYAN** an invoice for the Matrixx Switch Modules for $2,316. **KIRAKOSYAN**'s address was listed in Yerevan, Armenia.

23. **U.S. Company 1** shipped the goods from Danbury, Connecticut to Armenia on or about May 10, 2022, and the goods were delivered in Yerevan, Armenia a few days later. The shipping label included the following warning on the front of the label:


These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations.

24. The members of the conspiracy provided false information to **U.S. Company 1** regarding the final destination of the shipment. The shipping label indicated that no electronic export information ("EEI") filing was required through the Automated Export System ("AES"). **U.S. Company 1** indicated no EEI filing was required because the value of the shipment was under $2,500 and no export license was required for Armenia as the destination and **KIRAKOSYAN** as the end user. By concealing that the final destination was Russia, the members of the conspiracy caused the failure to file the EEI through the AES by providing false information.

25. **KIRAKOSYAN** and **Unindicted Co-Conspirator 2** (acting on behalf of **VAKUUM**) entered into a contract dated on or about April 26, 2022, for the sale and transfer of the **U.S. Company 1** product from **KIRAKOSYAN** to **VAKUUM**. [redacted] had an invoice in the amount of $3,290 for the transaction between **VAKUUM** and **KIRAKOSYAN**, and the invoice's notes stated that it was for the "Matrixx Standard Switch Module." [redacted] also had wiring instructions dated on or about May 3, 2022, for the transfer of funds from **KIRAKOSYAN**'s Armenian bank account to **U.S. Company 1**'s U.S. account.

26. On or about May 17, 2022, **KIRAKOSYAN** shipped the **U.S. Company 1** product to **VAKUUM** in Russia, and the price on the shipment packing information was listed as $3,290.

27. Starting on or about May 9, 2022, a license was required for export or reexport to Russia of the **U.S. Company 1**'s Matrixx Standard HiPIMS Switch-1 Input > 4 Outputs. No BIS export license was obtained to export or reexport this item to Russia.

**B. U.S. Company 2 Transaction**

28. In mid to late-2023, **KIRAKOSYAN** and co-conspirators purchased evaporation pellets (typically used in, among other things, the research and testing of semiconductors) from **U.S. Company 2**. **KIRAKOSYAN**, among other things and as described below, balked when asked by **U.S. Company 2** to produce an end user statement attesting to the eventual consignee of the products. **VAKUUM** funded the transaction and was the true consignee of the shipment. As **VAKUUM** was, by then, an SDN, the members of the conspiracy caused a violation of IEEPA by concealing **VAKUUM**'s role and thus causing **U.S. Company 2** to engage in a prohibited transaction with, for, and on behalf of an SDN without first obtaining the required OFAC license.

29. On or about March 21, 2023, **Unindicted Co-Conspirator 1** emailed [redacted] and three employees of another Russian company regarding a procurement request for evaporation pellets with certain chemical compositions. In summer 2023, **U.S. Company 2** and **KIRAKOSYAN** reached an agreement for the purchase and shipment of evaporation pellets with these specifications to Armenia. In March 2023, **U.S. Company 2** sent to **KIRAKOSYAN** a quotation for two products (totaling $1,870 with shipping). On or about May 5, 2023, **KIRAKOSYAN** sent a purchase order, and **KIRAKOSYAN** confirmed the transaction. Wire transfer instructions dated on or about that same day reflected the transfer of 236,000 Russian Rubles (or about $3,050 USD at prevailing exchange rates) from **VAKUUM** to **KIRAKOSYAN** for the evaporation pellets.

30. On or about May 31, 2023, **KIRAKOSYAN** sent the payment by wire to **U.S. Company 2**. The wiring instructions were from a bank in Yerevan, Armenia, and the beneficiary was **U.S. Company 2** for $1,870. On or about June 15, 2023, **U.S. Company 2** asked **KIRAKOSYAN** to complete an end user statement and sent to him a copy of BIS's standard Form 711. Among other things, Form 711 asks for the identity of the ultimate consignee and purchaser, and the signer is advised that "the making of any false statements or concealment of any material fact in connection with this statement may result in imprisonment or fine, or both and denial, in whole or in part, of participation in U.S. exports and reexports."

31. On or about June 15, 2023, **KIRAKOSYAN** sent the end user statement request to [redacted] and **Unindicted Co-Conspirator 1** stating, "[**U.S. Company 2**] requires an end user statement." **Unindicted Co-Conspirator 1** wrote back, "Good afternoon, the end user can only be in Armenia after all. You have a chance?" And **KIRAKOSYAN** wrote back, "Unfortunately, no, since we are now very strict on these issues." **Unindicted Co-Conspirator 1** forwarded this email chain to [redacted]. **Unindicted Co-Conspirator 1** wrote back to **KIRAKOSYAN** (cc'ing [redacted]), "Since there is no one in Armenia to sign the [end user statement], then the money needs to be returned from the Americans."

32. On or about June 20, 2023, **KIRAKOSYAN** wrote back to **U.S. Company 2**: "if you are able to send the product without providing an 'end user statement,' then please send it. If not, please transfer the money back to my account[.]" In late June 2023, **U.S. Company 2** and **KIRAKOSYAN** agreed on terms for a shipment. **KIRAKOSYAN** sent this confirmation to **Unindicted Co-Conspirator 1**, who then forwarded it to [redacted]. On or about June 29, 2023, **Unindicted Co-Conspirator 1** told [redacted], "[**U.S. Company 2**] agreed to ship Kamo without the [end user statement]." [redacted] replied that they may ask for the end user

statement before shipment and suggested using another supplier. [redacted] commented that **U.S. Company 2** agreed after the possibility of cancellation came up.

33. In or about and between August and September 2023, **KIRAKOSYAN** gave his Co-Conspirators regular updates on delays in the shipment. On or about September 20, 2023, **U.S. Company 2** shipped the evaporation pellets to **KIRAKOSYAN** in Armenia. On or about September 18, 2023, **KIRAKOSYAN** received an email from UPS notifying him that a parcel was on the way from **U.S. Company 2** (the notification can be sent before a company tenders a package to UPS). The next day, **KIRAKOSYAN** forwarded the UPS shipping information, including the tracking number, to **Unindicted Co-Conspirator 1**, who responded by thanking **KIRAKOSYAN**. On or about September 24, 2023, **KIRAKOSYAN** received an email from UPS notifying him that the **U.S. Company 2** shipment would be delivered on or about September 25, 2023. **KIRAKOSYAN** thus kept his Co-Conspirators apprised of the status of the shipment.

34. On or about September 25, 2023, the evaporation pellets were delivered to Armenia and received by "KAMO" (**KIRAKOSYAN's** first name).

35. A license was required from BIS for export or reexport to Russia of the **U.S. Company 2**'s evaporation pellets. Further, because **VAKUUM** was designated on the SDN List, a license from OFAC was required for the transaction. The members of the conspiracy did not obtain the required licenses from either OFAC or BIS for the transaction with **U.S. Company 2**.

**C. Attempted U.S. Company 3 Transaction**

36. In April 2022, the members of the conspiracy attempted to purchase semiconductor manufacturing equipment from a company based in Austin, Texas.

37. On or about April 19, 2022, [redacted] and **Unindicted Co-Conspirator 1** sent an email to an employee of a shipper/freight forwarder based in New York. The email indicated that [redacted] would be signing a contract with **U.S. Company 3**. He further indicated that the contract would be for two systems "like shown below . . . ." As discussed below, this communication was about two **U.S. Company 3** LSC-4000 devices. The LSC-4000 was a "Large Substrate Cleaner" that **U.S. Company 3** sold as a standalone cleaner used in, among other applications, the manufacture of silicon on sapphire semiconductor wafers, semiconductors, and display panels.

38. On or about February 25, 2022, [redacted] emailed **U.S. Company 3** employees to inquire "how sanctions can influence our ongoing projects . . . 2xLSC, SW3000 U1 . . . if necessary maybe we can cancel order for 2xLSC and maybe new order will immediately come from not Russia place[.]" **U.S. Company 3**'s CEO responded that day: "In our shipments what matters is the ultimate end user, so your suggestion would not work, but maybe things improve."

39. **VAKUUM** was working with multiple potential end users for **U.S. Company 3**'s products, including, but not limited to, a Russian company that provided components and electronics to the Russian government and that was added to the Entity List on or about March 9, 2022.

40. On or about February 28, 2022, a **U.S. Company 3** employee emailed [redacted]: "I just spoke to the US Department of Commerce and they told me I have to submit an Export License Request but based on what I said we should not have any issues exporting the cleaners" and asking for end user information. [redacted] and **U.S. Company 3** employees had additional contacts, but the transaction was not completed.

41. In addition, on or about March 28, 2022, [redacted] inquired via email about **U.S. Company 3** sending a product to a company called Crocus in Russia. Crocus was added to the Entity List on or about March 3, 2022, and OFAC added it to the SDN List on or about September 15, 2022. A **U.S. Company 3** employee indicated that an export license would be required. [redacted] eventually did not pursue the purchase and acknowledged that Crocus was sanctioned by the U.S. government.

42. On or about April 19, 2022, [redacted] emailed the CEO of **U.S. Company 3** and another **U.S. Company 3** employee stating, "we have a customer in Armenia for SW3000. Due to it being out of any sanctions I hope it will not be a problem to supply?" This was a reference to a **U.S. Company 3** SWC 3000, which is a "single-wafer cleaning" system that is used to clean and process semiconductor wafers. That day, the CEO of **U.S. Company 3** wrote: "Yes we can deliver SWC-3000 to Armenia, please provide the specification and application for example wafer and/or mask sizes CMP or resist residue removal, etc." On or about August 3, 2022, [redacted] emailed the CEO of **U.S. Company 3** and wrote: "[T]hat project looks actual again. Due to lack of experience they asked us what configuration to buy." The CEO of **U.S. Company 3** wrote back on or about August 6, 2022: "Please find our quote is attached. Also please provide the end user information."

D. **Evidence of Willfulness**

43. [redacted] and **VAKUUM** had ties to, among other things, the Russian nuclear industry and weapons industry. On or about November 22, 2021, an individual associated with the Federal State Unitary Enterprise Dukhov Automatics Research Institute ("VNIIA") sent what appeared to be a request for quotes or supply to **VAKUUM**. VNIIA was a Russian institute that designed nuclear warheads for both strategic and tactical platforms, including the design and

production of electric and neutron initiation systems for Russia's warheads. Effective February 24, 2022, BIS added VNIIA to the Entity List, thereby requiring a license to export or reexport U.S items subject to the Export Administration Regulations ("EAR") to VNIIA. BIS moved VNIIA to its Entity List from its Military End-User List, on which BIS had placed VNIIA effective December 23, 2020, which required a license to export or reexport specified items subject to the EAR destined for VNIIA, a military end user. On February 24, 2023, OFAC designated VNIIA on the SDN List, subjecting it to U.S. blocking sanctions and a general prohibition on business interactions with U.S. persons or entities.

44. The communication from VNIIA asked whether **VAKUUM** would be able to supply, among other things, technologies related to superconductors and plasma etching. Notably, the document stated: "We also draw your attention to the fact that [the Institute] is included in the United States of America sanctions list (Federal Register 85 FR 83799 12/23/2020)."

45. **KIRAKOSYAN** also informed [redacted] of ways to evade U.S. sanctions laws. On or about May 24, 2022, he sent to [redacted] instructions or information on opening a bank account in Armenia. **KIRAKOSYAN** noted: "For Russians under sanctions, opening an account in an Armenian bank is one of the opportunities to return to work with foreign clients, receive payment at an adequate rate, and use international services."

46. The scheme was structured to use **KIRAKOSYAN** as the straw or substitute purchaser of U.S.-origin goods for **VAKUUM** shortly after Russia's full-scale invasion of Ukraine on February 24, 2022, and the imposition of additional sanctions and export restrictions on Russia. **KIRAKOSYAN** represented to U.S. companies that he was the buyer/recipient when he knew that he was acting on behalf of his Russian co-conspirators to send the items ultimately to Russia.

47. In or about March 2022, **U.S. Company 1** employees asked **KIRAKOSYAN** for end user information. **KIRAKOSYAN** turned to [redacted] to collude on the answers, and [redacted] told **KIRAKOSYAN**: "It will be on your behalf [referencing **KIRAKOSYAN**]. This is a small thing. I think no one will pay attention to him. He [referencing the **U.S. Company 1** employee] needs it to report that he is doing everything legally."

48. On or about March 1, 2023, [redacted] emailed the CEO and another employee of **U.S. Company 3** to notify them that **VAKUUM** had been "added to SDN sanction list" and included a link to OFAC's public announcement. He thus knew **VAKUUM** was a sanctioned entity during the transaction with **U.S. Company 2** and attempted transaction with **U.S. Company 3**.

**<u>COUNT ONE</u>**
**Conspiracy to Violate Federal Law**
**(18 U.S.C. § 371)**

49. Count One incorporates by reference, as if fully set forth herein, paragraphs one through forty-eight of this Indictment.

50. Beginning in or around February 2022, the exact date being unknown, and continuing through at least in or about August 2024, in the Western District of Texas and elsewhere, the Defendants,

**(1) [redacted] and (2) KAMO KIRAKOSYAN,**

did knowingly and willfully combine, conspire, and agree with others known and unknown to the Grand Jury, including **Unindicted Co-Conspirator 1** and **Unindicted Co-Conspirator 2**, to commit one or more offenses against the United States, specifically:

a. To knowingly and willfully export and reexport goods subject to the EAR, 15 C.F.R. Parts 730-774, from the United States to the Russian Federation

through the Republic of Armenia without having first obtained the required licenses from BIS, in violation of ECRA, 50 U.S.C. § 4819;

b. To knowingly and willfully engage in transactions intended to evade the EAR, in violation of 50 U.S.C. § 4819;

c. To knowingly and willfully violate and cause a violation of a license, order, regulation, and prohibition issued pursuant to the IEEPA, 50 U.S.C. § 1705;

d. To knowingly and willfully engage in transactions intended to evade the IEEPA, in violation of 50 U.S.C. § 1705;

e. To fraudulently and knowingly export and send from the United States merchandise, articles, and objects contrary to law and regulations of the United States, and receive, conceal, and sell, and facilitate the transportation, concealment, or sale of such merchandise, articles, and objects, prior to exportation, knowing the same to be intended for exportation contrary to laws and regulations of the United States, in violation of 18 U.S.C. § 554(a); or

f. To knowingly fail to file Electronic Export Information through the Automated Export System, and cause the same, in violation of 13 U.S.C. § 305;

and one or more of the co-conspirators knowingly committed one or more of the overt acts alleged in paragraphs fifteen to forty-eight of this Indictment in the Western District of Texas to accomplish some object or purpose of the conspiracy.

In violation of 18 U.S.C. § 371.

**COUNT TWO**
**Conspiracy to Defraud the United States**
**(18 U.S.C. § 371)**

51. Count Two incorporates by reference, as if fully set forth herein, paragraphs one through forty-eight of this Indictment.

52. Beginning in or around February 2022, the exact date being unknown, and continuing through at least in or about August 2024, in the Western District of Texas and elsewhere, the Defendants,

**(1) [redacted] and (2) KAMO KIRAKOSYAN,**

did knowingly and willfully combine, conspire, and agree with others known and unknown to the Grand Jury, including **Unindicted Co-Conspirator 1** and **Unindicted Co-Conspirator 2**, to defraud the United States and its agencies by impeding, impairing, obstructing, and defeating the lawful functions of the following agencies through deceitful and dishonest means, specifically:

a. The U.S. Department of Commerce in the enforcement of the Export Control Reform Act ("ECRA") and the EAR;

b. OFAC in the enforcement of sanctions imposed pursuant to IEEPA; and

c. The U.S. Customs and Border Protection in the enforcement of the Federal Trade Regulations, including the Electronic Export Information filing requirements;

and one or more of the co-conspirators knowingly committed one or more of the overt acts alleged in paragraphs fifteen to forty-eight of this Indictment in the Western District of Texas to accomplish some object or purpose of the conspiracy.

In violation of 18 U.S.C. § 371.

**<u>COUNT THREE</u>**
**Attempt to Violate Export Control Reform Act**
**(50 U.S.C. § 4819(a)(2)(C))**

53. Count Three incorporates by reference, as if fully set forth herein, paragraphs one through forty-eight of this Indictment.

54. In or around April 2022, within the Western District of Texas and the extraterritorial jurisdiction of the United States, the Defendants,

**(1) [redacted] and (2) KAMO KIRAKOSYAN,**

did knowingly and willfully attempt to export and reexport, to cause to be exported and reexported, to evade U.S. export control laws, and to buy, conceal, sell, transfer, transport, forward, and otherwise service, in whole or in part, and conduct negotiations to facilitate the export from the United States to the Russian Federation via the Republic of Armenia certain goods that they believed were subject to U.S. export control laws, specifically: a standalone cleaner used in, among other applications, the manufacture of silicon on sapphire semiconductor wafers, semiconductors, and display panels.

In violation of 50 U.S.C. § 4819(a)(1), (a)(2)(C), and (b).

**<u>COUNT FOUR</u>**
**Attempted Smuggling**
**(18 U.S.C. § 554(a))**

55. Count Four incorporates by reference, as if fully set forth herein, paragraphs one through forty-eight of this Indictment.

56. In or around April 2022, within the Western District of Texas and the extraterritorial jurisdiction of the United States, the Defendants,

**(1) [redacted] and (2) KAMO KIRAKOSYAN,**

did fraudulently and knowingly attempt to export and send from the United States and to receive, conceal, buy, and sell and to facilitate the transportation, concealment, and sale of merchandise, specifically: a standalone cleaner used in, among other applications, the manufacture of silicon on sapphire semiconductor wafers, semiconductors, and display panels, prior to exportation, knowing the same was intended for exportation from the United States contrary to laws and regulations of the United States, including: 50 U.S.C. § 4819, 13 U.S.C. § 305, 15 C.F.R. 30.71(a), and 764.2.

In violation of 18 U.S.C. § 554(a).

**COUNT FIVE**
**Violation of Export Control Reform Act**
**(50 U.S.C. § 4819(a)(1))**

57. Count Five incorporates by reference, as if fully set forth herein, paragraphs one through forty-eight of this Indictment.

58. In or around May 2022, within the extraterritorial jurisdiction of the United States, the Defendants,

**(1) [redacted] and (2) KAMO KIRAKOSYAN,**

did knowingly and willfully export, reexport, and cause to be exported and reexported from the United States to the Russian Federation via the Republic of Armenia certain goods without the required license from BIS, specifically: a Matrixx Standard HiPIMS Switch-1 Input > 4 Outputs, and did evade U.S. export control laws.

In violation of 50 U.S.C. § 4819(a)(1), (a)(2)(A), (a)(2)(G), and (b).

**COUNT SIX**
**Smuggling**
**(18 U.S.C. § 554(a) & 2)**

59. Count Six incorporates by reference, as if fully set forth herein, paragraphs one through forty-eight of this Indictment.

60. In or around May 2022, within the extraterritorial jurisdiction of the United States, the Defendants,

**(1) [redacted] and (2) KAMO KIRAKOSYAN,**

did fraudulently and knowingly export and send from the United States and receive, conceal, buy, and sell and did facilitate the transportation, concealment, and sale of merchandise, specifically: a Matrixx Standard HiPIMS Switch-1 Input > 4 Outputs, prior to exportation, knowing the same was intended for exportation from the United States contrary to laws and regulations of the United States, specifically: 50 U.S.C. § 4819, 13 U.S.C. § 305, 15 C.F.R. 30.71(a), and 764.2.

In violation of 18 U.S.C. §§ 554(a) & 2.

A TRUE BILL

FOREPERSON

JUSTIN R. SIMMONS
UNITED STATES ATTORNEY

By: ______________________________
FOR: G. KARTHIK SRINIVASAN
ASSISTANT UNITED STATES ATTORNEY